STATE OF NEVADA, et al., Petitioners,

States of Wisconsin, Mississippi and Utah, Intervenors,

v.

John HERRINGTON, Secretary of the Department of Energy, Respondent.

DEPARTMENT OF ECOLOGY OF the STATE OF WASHINGTON, et al., Petitioners,

v.

John HERRINGTON, Secretary of the Department of Energy, Respondent.

Nos. 86–7311, 86–7456.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1987.

Decided Sept. 17, 1987.

Michael M. Later, Salt Lake City, Utah, for intervenor State of Utah.

Sidney J. Martin, Jackson, Miss., for intervenor State of Miss.

Martin W. Matzen, Washington, D.C., for respondent.

Malachy R. Murphy, Olympia, Wash., for petitioners State of Nev.

Narda Pierce, Olympia, Wash., for intervenor State of Wash.

Carl A. Sindferbrand, Madison, Wis., for intervenor State of Wis.

Before SCHROEDER, WIGGINS and THOMPSON, Circuit Judges.

SCHROEDER, Circuit Judge:

Nevada, Washington, Utah, Mississippi, and Wisconsin petition this court for review of the Secretary of Energy's decision that the states may not use grant monies from the Nuclear Waste Fund to finance their participation in judicial review proceedings under the Nuclear Waste Policy Act of 1982, Pub.L. No. 97–425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101–10226) (NWPA or Act). This is a direct appeal from the Secretary's final decision denying the states' grant application requests for funding of litigation expenses. The Act vests the United States Court of Appeals with original and exclusive jurisdiction over civil actions for review of any final decision or action of the Secretary. 42 U.S.C. § 10139(a)(1)(A).

Congress created the Nuclear Waste Fund through the NWPA to pay the costs incurred in the development and operation of nuclear waste repositories. The Act establishes a very complex scheme for determining waste disposal sites, provides for state participation in that process, and shifts the expense of site selection to the generators of nuclear waste. States with potentially acceptable repository sites qualify for grants from the generator-fed Fund to cover their participation costs for specified activities. Section 10136(c)(1)(A) of the NWPA provides that the Secretary shall make grants to each affected state "for the purpose of participating in activities required by sections 10136 and 10137 of this title or authorized by written agreement entered into pursuant to section 10137(c) of this title."

Because petitioners are affected states, *i.e.*, notified that they contain a potential repository site, they are eligible to apply for, and in fact have received, grants from the Nuclear Waste Fund to finance their participation expenses. Nevada's financial assistance grant application for fiscal year 1986 was approved by DOE on April 30, 1986, but contained a restriction on the use of grant funds to cover litigation costs against the United States. Washington's 1986 grant contained a similar blanket restriction. Washington then specifically requested an additional $200,000 in grant funds to cover litigation expenses against DOE, and its request was denied on June 17, 1986. The Secretary also rejected the funding requests of Utah, Mississippi, and Wisconsin for their litigation expenses incurred in challenging the adequacy of the guidelines established by DOE for the selection of repository sites.[1] The states

---

1. The NWPA required the Secretary to issue general guidelines to serve as the primary criteria for the selection of sites in various geologic media. 42 U.S.C. § 10132(a). The Secretary issued the guidelines, 10 C.F.R. Part 960, on

challenge here the disapproval of their grant requests for litigation expenses.

The petitioners argue that judicial review is a required activity under sections 10136 and 10137, and seek a declaratory judgment that the Secretary's limitation on states' ability to expend Fund grants for litigation costs against the government is illegal. We disagree and uphold the Secretary's decision.

This court reviews de novo the construction of a statute. *See United States v. Louisiana-Pacific Corp.*, 754 F.2d 1445, 1447 (9th Cir.1985). The issue we must decide is one of statutory interpretation, and it must be analyzed in the context of the entire statutory scheme enacted by Congress to cope with the pressing problem of nuclear waste disposal.

In response to the growing national concern about accumulating radioactive waste and spent nuclear fuel, Congress passed the NWPA to provide for the establishment of "programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel...." H.R.Rep. No. 491, 97th Cong., 2d Sess., pt. 1, at 26, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3792, 3792. The Act has the stated purposes of (1) establishing a schedule for the siting, construction, and operation of repositories that will assure adequate protection from the hazards of radioactive waste, (2) establishing federal responsibility for the disposal of such waste, (3) defining the relationship between the federal and state governments, and (4) establishing the Nuclear Waste Fund to cover the costs of the disposal program. 42 U.S.C. § 10131(b).

### The Siting Process

A brief description of the siting process is useful in understanding the nature of the statutory scheme and the status of the petitioners. The NWPA requires the Department of Energy (DOE) to site, construct, and operate by 1998, a repository for the disposal of nuclear waste. *Id.* § 10131(b)(1). Section 10136(a) requires the DOE to identify, within 90 days of the passage of the NWPA (January 7, 1983), an unspecified number of "potentially acceptable" repository sites. A potentially acceptable site is defined as "any site at which, after geologic studies and field mapping but before detailed geologic data gathering, the Department undertakes primary drilling and geophysical testing for the definition of site location." *Id.* § 10136(a). Ninety days thereafter, the DOE is required to notify the governor, the state legislature, and the tribal council of any affected Indian tribe in any state affected by the identification. *Id.* From these states the DOE, using certain guidelines, must nominate five sites as suitable for a repository. *Id.* § 10132(b)(1)(A). The DOE must then choose three candidate sites and submit them to the President for approval. *Id.* § 10132(b)(1)(B). The President must approve or disapprove the sites within 60 days in accordance with section 10132(c)(1).

Sites approved by the President will be subject to "site characterization," *i.e.*, further detailed study. *Id.* § 10133. After public hearings, the DOE then selects one of the three sites and recommends it for construction of the permanent repository. *Id.* § 10134(a)(1). If the President, pursuant to section 10134(a)(2), recommends approval of the site to Congress for development as a repository, the state in which the site is located may submit, within 60 days, a notice of disapproval to Congress under section 10136(b)(2). This disapproval prevents the use of the site as a repository unless Congress passes a joint resolution approving the President's recommendation. *Id.* § 10135(c). If the President's recommendation becomes effective, the Secretary must then submit a construction application to the Nuclear Regulatory Commission

November 30, 1984. 49 Fed.Reg. 47752 (Dec. 6, 1984). Almost immediately, the guidelines were challenged in this Court by the Environmental Policy Institute, the Sierra Club, and the National Parks and Conservation Association, *et al.*, No. 84–7584. Several subsequent petitions were either filed in this Court or transferred here from other circuits pursuant to 28 U.S.C. § 2112(a). All of these guideline cases have been consolidated with the initial petition. Petitioners Nevada and Washington, as well as intervenors Mississippi, Utah, and Wisconsin, are all parties in the consolidated action.

(Commission) for authorization to construct the repository.

Currently, the Secretary has recommended and the President has approved three states for site characterization, two of which are petitioners Nevada and Washington. 51 Fed.Reg. 19783 (June 2, 1986). Intervenors Mississippi and Utah are among the states notified by the Secretary that they contain a potentially acceptable site for the first repository. Intervenor Wisconsin is among the states notified that they are being considered for a second repository.[2]

Throughout this detailed siting process, affected states and Indian tribes have statutory participation rights. S.Rep. No. 282, 97th Cong., 1st Sess. 11 (1981). From the beginning of serious consideration of a federal nuclear waste disposal program, Congress recognized the need for significant participation on the part of affected states in the establishment of such facilities. *Id.* at 7. Because high-level radioactive waste had become a major subject of public concern, Congress viewed state participation as an appropriate precaution to insure that such waste would not adversely affect the public health, safety, and environment of this or future generations. 42 U.S.C. § 10131(a)(7). "The independent oversight and peer review which only the states are poised to provide would immeasurably 'promote public confidence' " in the safety of the disposal system. *Nevada v. Herrington,* 777 F.2d 529, 532 (9th Cir.1985) (*Nevada I*); 42 U.S.C. § 10131(a)(6). Thus, the Act gives affected states a "cooperative and concurrence role" in the federal program. 42 U.S.C. § 10137(b).

The DOE has two separate obligations in this regard. The first is an obligation to "consult and cooperate." Section 10137(b) requires the DOE, "[i]n performing any study of an area within a State for the purpose of determining the suitability of such area for a repository pursuant to section 10132(c)," and in subsequently developing any repository within such state, to consult and cooperate with the state, "to

the maximum extent feasible," to resolve concerns regarding the public health and safety, environmental, and economic impacts of any such repository. The second is a formal agreement to ensure state participation. Section 10137(c) requires the DOE to enter into a binding written consultation and cooperation agreement not later than 60 days after (1) the approval of a site for site characterization under section 10132(c), or (2) the written request of a State notified under section 10136(a) that it contains a potentially acceptable site. *See also Tennessee v. Herrington,* 806 F.2d 642, 651 n. 9 (6th Cir.1986) (discussing DOE's section 10137 obligations), *cert. denied,* —— U.S. ——, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). These agreements must specify procedures by which the state may study, comment on, and make recommendations regarding the public impacts of a repository; by which the Secretary must respond to the state's comments and recommendations; by which the state may conduct independent monitoring and testing of activities on the repository site; and by which objections of a state are resolved. 42 U.S.C. § 10137(c).

In addition to the section 10137 consultation and cooperation mechanism, section 10136 outlines the states' participation role in the siting process. Section 10136(c)(1)(B) authorizes a state's review of siting activities to determine potential economic, social, public health and safety and environmental impacts of a repository on the state and its residents. The subsection also provides that a state may develop a request for impact assistance; engage in monitoring, testing, or evaluation activities with respect to site characterization programs; provide information to its residents regarding any activities of the state, the Secretary, or the Commission with respect to the site; and request information from, and make comments and recommendations to, the Secretary regarding any activities authorized by the Act.

---

2. The NWPA authorized a program to locate a site for, but not to construct, a second reposito-

ry. *See* 42 U.S.C. § 10132(b)(1)(C).

*The Nuclear Waste Fund*

To pay the costs incurred in the development and operation of the nuclear waste repository, Congress established the Nuclear Waste Fund "composed of payments made by the generators and owners of such waste and spent fuel, [to] ensure that the costs of carrying out activities relat[ed] to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel." 42 U.S.C. § 10131(b)(4). The Fund is created by section 10222(c) as a separate account in the U.S. Treasury to pay only the costs authorized by the NWPA. H.R. Rep. No. 491, *supra*, at 59, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3825. The Fund is supported by a mandatory fee on electricity generated by nuclear power, and is administered by the Secretary. 42 U.S.C. § 10222(d) and (e). If the Secretary determines that revenues are insufficient to offset the costs as defined in section 10222(d), he may propose an adjustment to the fee to insure full cost recovery. *Id.* § 10222(a)(4).

The Act describes and limits the uses to which Nuclear Waste Fund grants may be put. The Fund is intended to be used for federal activities directly related to the development of licensed repositories, and for such treatment or packing as is technically required prior to disposal of the waste. H.R.Rep. No. 491, *supra,* at 59–60, *reprinted in* 1982 U.S.Code Cong. & Admin. News 3825–26. The Fund also covers the costs (1) of participation by states and Indian tribes in repository site selection, development, and operation and (2) of impact assistance to states where repositories have received construction authorization from the Commission. *Id.*

There are specific statutory provisions requiring funding to states at different stages of the site selection process. Thus, section 10136(c)(1)(B) requires grants when the President has approved a candidate site. Section 10136(c)(2)(A) requires grants when the Commission has authorized construction. Section 10137(c) requires grants when the state and DOE have entered into a written cooperation agreement.

We first had occasion to construe the NWPA's funding provisions in our 1985 *Nevada I* decision. There, Nevada sought funding for technical studies designed to evaluate whether its Yucca Mountain area should be used as a nuclear waste repository. 777 F.2d at 530. DOE refused to fund the studies concluding that Congress only intended to trigger federal funding after a state had entered the site characterization phase. *Id.* at 533. At that time, Nevada had been notified that it contained a potential repository site, but the Secretary had not yet recommended any site for site characterization. *Id.* at 531.

In *Nevada I,* we construed section 10136(c)(1)(A). It requires grants "to each State notified under subsection (a) [that it contains a potentially acceptable site] for the purpose of participating in *activities required by sections 10136 and 10137* or authorized by written agreement." 777 F.2d at 532 (emphasis in opinion). We held in *Nevada I* that this section is a "catchall" provision, authorizing funding in other stages of the siting process in which funding is not specifically triggered by sections 10136(c)(1)(B), (c)(2)(A), or 10137(c). 777 F.2d at 532. To avoid treating this section as superfluity, we authorized pre-site characterization funding for activities specified in sections 10136 and 10137. *Id.*

Although we sanctioned the funding of certain pre-site characterization activities in *Nevada I,* we emphasized that a "state is not entitled to *carte blanche* access to the Nuclear Waste Fund." *Id.* at 534. The funded activities must be activities required by sections 10136 and 10137. In *Nevada I,* the state's independent hydrologic and geologic studies of its Yucca Mountain area clearly fell within section 10136's funding authorization for "any monitoring, testing, or evaluation." 42 U.S.C. § 10136(c)(1)(B)(iii); 777 F.2d at 534. Thus, the question here becomes whether judicial review is an activity required by sections 10136 and 10137.

*Discussion*

We agree with the Secretary that judicial review is not an activity which Congress

intended the Nuclear Waste Fund to finance. We do not, however, rest our decision on the general fee-shifting principles urged by DOE. In disallowing the use of Nuclear Waste Fund grants for litigation expenses incurred against the United States, the Secretary relies on an Office of Management and Budget (OMB) Circular No. A–87, Attachment B, Subsection B–16, 46 Fed.Reg. 9548, 9552 (Jan. 28, 1981), which provides:

> 16. *Legal expenses.* The cost of legal expenses required in the administration of grant programs is allowable. Legal services furnished by the chief legal officer of a State, local or Indian tribal government or his staff solely for the purpose of discharging his general responsibilities as legal officer are unallowable. *Legal expenses for the prosecution of claims against the Federal Government are unallowable.* (emphasis added).

The OMB Circular, adopted two years prior to the passage of the NWPA, sets forth general cost principles for determining the allowable costs of programs administered by states under grants from the federal government. The circular itself states that its principles "are not intended to identify the circumstances or dictate the extent of Federal and State or local participation in the financing of a particular grant." Attachment A, Subsection A–1, 46 Fed.Reg. at 9548. Reliance on this circular is clearly inappropriate.

The government has used the OMB Circular as support for the general principle that a party bears its own litigation expenses unless Congress has otherwise provided. *See Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685 n. 7, 103 S.Ct. 3274, 3277

n. 7, 77 L.Ed.2d 938 (1983). The unique nature of the NWPA, however, renders traditional fee-shifting principles inapplicable. The circular disallows the use of grant funds for the prosecution of "claims against the Federal Government." In the traditional sense a claim against the government means a right to demand money from the United States. *Hobbs v. McLean,* 117 U.S. 567, 575, 6 S.Ct. 870, 873, 29 L.Ed. 940 (1886). These petitioners are not seeking money from the government's coffers; rather, they seek financial assistance from the Nuclear Waste Fund. Thus, the question here is whether the NWPA's state participation provisions require the funding of litigation expenses, not whether the OMB Circular or general fee-shifting principles exclude them.

The states contend that the language of section 10136 itself mandates funding for judicial review because on its face it authorizes funding of "review" of the Secretary's activities under the Act. When we look to the context of the word "review," however, we find the more plausible construction of the word is that it is limited to a state's independent evaluation of siting activities and does not encompass a court's review. Section 10136(c)(1)(B) sets forth an exhaustive list of activities for which a state may use grant funds.[3] The express language of this section provides that grants may be made to each state "only for purposes of enabling *such State*—(i) to review activities" taken under the Act. (emphasis added). Our interpretation of this provision as limited to state review rather than federal court review is consistent with the other enumerated activities specified in the section; activities in-

---

3. 42 U.S.C. § 10136(c)(1)(B) provides:

The Secretary shall make grants to each State in which a candidate site for a repository is approved under section 10132(c) of this title. Such grants may be made to each such State only for purposes of enabling such State—
(i) to review activities taken under this part with respect to such site for purposes of determining any potential economic, social, public health and safety, and environmental impacts of such repository on the State and its residents;
(ii) to develop a request for impact assistance under paragraph (2);

(iii) to engage in any monitoring, testing, or evaluation activities with respect to site characterization programs with regard to such site;
(iv) to provide information to its residents regarding any activities of such State, the Secretary, or the Commission with respect to such site; and
(v) to request information from, and make comments and recommendations to, the Secretary regarding any activities taken under this part with respect to such site.

**1400**

volving a state's information gathering, evaluation, and dissemination to its residents. As we stated in *Nevada I*, the NWPA's state participation provisions authorize "independent oversight and peer review" by states. 777 F.2d at 532. Neither the language of section 10136 nor its legislative history makes any reference to judicial review.

 The states also contend that funding for judicial review is mandated by section 10137(c)(11). That section provides that the consultation and cooperation agreement must specify procedures for resolving a state's objections "through negotiation, arbitration, or other appropriate mechanisms." Petitioners argue that "other appropriate mechanisms" include judicial review. This contention also fails.

The Secretary argues that the procedures specifically enumerated are alternatives to litigation and, therefore, judicial review cannot be another appropriate mechanism within section 10137(c)(11). This is in accordance with the statutory construction rule of *ejusdem generis* which limits general terms which follow specific ones to matters similar to those specified. *See, e.g., Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). Under that rule, "other appropriate mechanisms" would be limited to dispute resolution procedures similar in nature to negotiation and arbitration. As our previous discussion of the structure of the NWPA indicates, the site selection process was not designed as an adversary procedure.

This is not to say that the states have no access to the courts. Congress provided for judicial review in section 10139 of the Act and the states are free to challenge DOE's actions pursuant to this provision. The fact that the judicial review provisions are in a separate section of the NWPA is, however, further indication that "activities required by sections 10136 and 10137" do not include judicial review.

Because we hold that the activities specified in sections 10136 and 10137 do not include judicial review, the petitions for review are denied.