The STATE OF NEVADA, Plaintiff,

v.

Robert F. BURFORD, Director, Bureau of Land Management, Department of the Interior, Edward F. Spang, Nevada State Director, Bureau of Land Management, Department of the Interior, Defendants.

No. CV–S–88–203–PMP (RJJ).

United States District Court,
D. Nevada.

Jan. 27, 1989.

As Corrected March 9, 1989.

---

Harry W. Swainston, Deputy Atty. Gen., Carson City, Nev., for plaintiff.

Allan D. Brock, U.S. Dept. of Justice, Land and Natural Resources Div., Gen. Litigation Section, Washington, D.C., for defendants.

## ORDER DISMISSING COMPLAINT

PRO, District Judge.

The State of Nevada filed a "Complaint for Mandamus, Injunctive and Declaratory Relief and for Judicial Review" (# 1) on March 25, 1988, in which it seeks to overturn the Bureau of Land Management's ("BLM") decision to issue a right-of-way reservation ("ROWR") which authorizes the Department of Energy ("DOE") to occupy, use and develop public lands near Yucca Mountain, in southwestern Nevada. Pursuant to the ROWR, DOE plans to study Yucca Mountain's characteristics as a possible site for a repository of high-level radioactive waste and spent nuclear fuel.

Nevada's Complaint alleges four causes of action. The first cause of action is a collection of claims, all of which seek this Court to rescind the BLM's issuance of the ROWR to the DOE. (# 1, ¶¶ 1.1–1.18, at 1–8)[1] The second cause of action claims that the BLM arbitrarily and unlawfully refuses to grant Miflin and Associates, a private enterprise under contract with Nevada, a right-of-way for access to study Yucca Mountain's characteristics as a possible site for the repository. The third cause of action claims that the BLM's issuance of the ROWR to the DOE unconstitutionally infringes on Nevada's equal footing and other rights reserved to the States by the Tenth Amendment. Finally, the fourth cause of action claims that no power exercisable under the Constitution authorizes the BLM's grant of the ROWR to the DOE.

Nevada seeks (1) an order directing the BLM to rescind the ROWR granted to the DOE; (2) and order directing the BLM to grant a right-of-way permit to Miflin & Associates; (3) declaratory judgment to enjoin the BLM from permitting DOE access to Yucca Mountain that would "entail unlawful infringement upon Nevada's constitutional and political rights"; and (4) declaratory judgment as to the constitutionality of those federal statutes upon which the BLM relied in granting the ROWR to the DOE.

On June 2, 1988, the BLM filed a Motion to Dismiss (# 15), for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). Specifically, the BLM asserts that Nevada lacks standing to raise the first, third, and fourth causes of action, and that the second cause of action is not yet ripe for judicial review. In addition, the BLM asserts that Nevada's third and fourth causes

---

1. The BLM focuses on the gravamen of Nevada's claims by summarizing the allegations contained in the Complaint as follows:

    BLM's issuance of a right-of-way is contrary to FLPMA and the order classifying management of the public lands under the Classification and Multiple Use Act of 1964 because it authorizes the Department of Energy to undertake activities inconsistent with valid, existing uses and that extensively disrupt the surface and subsurface;

    To the extent the right-of-way authorizes the Department of Energy to undertake activities inconsistent with valid, existing uses, it in fact classifies anew or withdraws the public lands without observance to the procedure and substance of FLPMA; and

    BLM's finding that the right-of-way authorizes activities that do not pose a significant impact on the environment is unreasonable because the environmental assessment supporting it relies upon a document of the Department of Energy that fails to satisfy the National Environmental Policy Act, 42 U.S.C. § 4321.
    (Citing Complaint, # 1, ¶¶ 1.12–1.14, at 6–8)

of action fail to state a claim upon which this Court can grant relief. Fed.R.Civ.P. 12(b)(6).

The State of Nevada filed an Opposition (# 19) to the BLM's Motion to Dismiss on July 15, 1988, to which the BLM filed a Reply (# 21) on August 15, 1988.

For the reasons discussed herein, this Court accepts the BLM's assertions, and therefore dismisses the State of Nevada's Complaint.

## PLEADING REQUIREMENTS

For purposes of the BLM's Motion to Dismiss, the factual allegations of the Nevada's Complaint must be presumed as true, and this court must draw all reasonable inferences in favor of Nevada, the non-moving party. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). This court does not, however, necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), *cert. den.* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).The liberal reading accorded complaints on 12(b)(6) motions is, moreover, subject to the requirement that the facts demonstrating standing must be clearly alleged in the complaint. *Id.* ("We cannot construe the complaint so liberally as to extend our jurisdiction beyond its constitutional limits."), citing *Jenkins v. McKeithen,* 395 U.S. 411, 422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969); *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231, 237 n. 7 (9th Cir.1980), *cert. denied,* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed. 2d 502 (1980).

In addition, this court may take judicial notice of facts outside the pleadings such as matters of public record, without converting BLM's Motion to Dismiss to one for summary judgment. *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986).

## BACKGROUND

In February 1983, pursuant to the Nuclear Waste Policy Act of 1982 ("NWPA"), 42 U.S.C. § 10101 (1982), Nevada was notified that certain public lands near Yucca Mountain were under consideration as a repository for the disposal and storage of high-level radioactive waste and spent nuclear fuel.[2] The BLM administers the lands in question under the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 ("FLMPA"). FLMPA directs that management of public lands shall be "on the basis

---

2. The NWPA entrusts the Secretary of Energy with the responsibility of identifying a site suitable for study as a potential repository for the storage of radioactive waste and spent nuclear fuel. 42 U.S.C. § 10101, *in passim.* The statute first requires the Secretary to issue guidelines for selecting possible sites in various geologic media. 42 U.S.C. § 10132(a) (1982). Second, the Secretary is to use those guidelines to nominate at least five sites that warrant intensive study, statutorily termed as "site characterization." 42 U.S.C. § 10132(b) (1982). An environmental assessment must accompany each of the nominations, which must "include a detailed statement of the basis for such recommendation and of the probable impacts of the site characterization activities planned for such site, and a discussion of alternative activities relating to site characterization that may be undertaken to avoid such impacts." 42 U.S.C. § 10132(b)(1)(E) (1982). After nominating at least five sites, the Secretary must recommend three for site characterization to the President. 42 U.S.C. § 10132(b)(1)(B) (1982). If the President approves that recommendation, the Secretary is to begin site characterization at each locale. *See generally* 42 U.S.C. § 10133 (1982).

In 1986, the Secretary announced the nomination of five sites as suitable for site characterization. *See* 51 Fed.Reg. 19783–19784 (June 2, 1986). On the same day, the Secretary announced that he had recommended three of the sites, one in Deaf Smith County, Texas, one at Yucca Mountain, Nevada, and one on the Hanford Reservation in Washington, for site characterization, and that the President had approved that recommendation. In 1987, Congress amended the NWPA to the extent that site characterization was to proceed only at one site, Yucca Mountain, Nevada. (See discussion, *infra.*)

Upon completion of site characterization, the Secretary must recommend to the President a single site for development as a repository. 42 U.S.C. § 10134(a)(1) (1982). Finally, the President shall submit that recommendation to Congress, triggering an elaborate procedure which will determine whether that site can in fact be developed as a repository. 42 U.S.C. §§ 10134–10137 (1982).

of multiple use." 43 U.S.C. § 1701(a)(7) (1976).[3]

On November 23, 1987, the DOE filed an application with the BLM for a right-of-way reservation ("ROWR") in order to perform site characterization studies at the Yucca Mountain site. The application also sought a ROWR over federally-owned land adjacent to the public lands, within the Nellis Air Force Range.

On December 21, 1987, Congress enacted the Nuclear Waste Policy Act Amendments of 1987, Pub.L. No. 100–203, Title V, § 5002 (1987) (codified at 42 U.S.C. § 10101 (West Supp.1988)). Pursuant to the 1987 Amendments, the Secretary of Energy is directed to undertake site characterization at only one locale, specifically, Yucca Mountain. Pub.L. 100–203, Title V, § 5011(e)–(g) (1987); 42 U.S.C. § 10133(a)–(c) (West Supp.1988).[4]

The 1987 Amendments do not, however, alter the one provision contained in the NWPA which regulates the role of the BLM insofar as granting access to Yucca Mountain for site characterization. Namely, section 120(a)(1), which provides in pertinent part:

> To the extent that the taking of any action related to the site characterization of a site ... under this part requires a certificate, *right-of-way*, permit, lease, or other authorization from a Federal agency or officer, such agency or officer *shall issue or grant such authorization* at the earliest practicable date, *to the extent permitted by the applicable pro-*

*visions of law* administered by such agency or officer. ...

.    .    .    .    .

> Any authorization issued or granted pursuant to ... this section shall include such terms and conditions as may be required by law, and may include terms and conditions permitted by law.
> 42 U.S.C. § 10140 (1982) (emphasis added).[5]

The BLM granted the ROWR to the DOE on January 6, 1988. The decision authorizes the DOE to undertake activities related to site characterization on 51,789 acres near Yucca Mountain. The ROWR extends only to the acreage which the BLM manages under FLPMA, it does not authorize DOE to undertake activities on the Nellis Air Force Range. On February 5, 1988, the State of Nevada, represented by the Nevada Attorney General, timely filed a Notice of Appeal, thereby initiating administrative review of the BLM's decision granting the ROWR by the Department of Interior Board of Land Appeals.[6]

Following Nevada's filing of this action, the Interior Board of Land Appeals granted Nevada's motion to stay the administrative proceedings pending the outcome of this action on August 3, 1988.

On September 30, 1987, Miflin and Associates, a private enterprise under contract with Nevada to independently assess Yucca Mountain's characteristics as a repository, applied to the BLM for access to the Yucca Mountain site for geologic and hydrologic

---

**3.** Multiple use is described as "making the most judicious use of the land for some or all of the public lands," and, where appropriate, allowing individuals to "use some land for less than all of the resources." 43 U.S.C. § 1702(c) (1976).

**4.** The Amendments explicitly state that if the Secretary determines during the site characterization work that Yucca Mountain is unsuitable for development as a repository, he shall terminate those activities and, within six months, provide recommendations on further action to Congress. Pub.L. 100–203, Title V, § 5011(g)(3) (1987); 42 U.S.C. § 10133(c)(3)(A)–(F) (West Supp.1988).

**5.** The BLM's Motion to Dismiss contains a concise discussion of its authority to allow the DOE

to occupy and use public lands adjacent to Yucca Mountain for purposes of conducting site characterization. (# 15, at 7–11) *See also* 43 U.S.C. § 1767 ("Rights of way for Federal departments and agencies"), *cross referenced* with 43 U.S.C. § 1732 ("Management of use, occupancy, and development of public lands").

**6.** The BLM incorporated DOE's environmental assessment, required under the NWPA. Nevada has claimed that the environmental assessment does not address the full range of issues required by the NWPA, and this contention is presently at issue before the Ninth Circuit Court of Appeals. *Nevada v. Herrington,* Case No. 86–7309. Accordingly, this court need not consider the adequacy of the environmental assessment.

testing in connection with Nevada's oversight role. Nevada seeks a Writ of Mandamus to compel the BLM to grant Miflin and Associates, as Nevada's contractor, a right-of-way to permit access for site characterization studies as part of Nevada's oversight and monitoring functions. In its Motion to Dismiss, the BLM states that it is currently considering Mifling and Associates' updated and corrected application.

### STANDING DOCTRINE OVERVIEW

The BLM challenges the standing of Nevada to maintain this action. Standing is highly case-specific, and turns on the precise allegations of the party seeking relief. *Compare Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (denying standing to an environmental organization challenging development of a ski resort in a national forest because it failed to identify "specific injury" to members) *with United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (finding pleadings alleged facts which, if true, would establish standing by environmental group to challenge Interstate Commerce Commission's allowance of rail freight increase which identified members whose recreational and aesthetic interests would be allegedly injured because rate increase would lead to heightened use of raw, instead of recycled, scrap metal).

Standing involves both limitations imposed by the "case or controversy" requirement of Article III of the Constitution and "prudential limits on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The standing doctrine limits the jurisdiction of federal courts to parties who demonstrate "injury in fact." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982).

The Supreme Court has the "injury in fact" requirement as embracing three separate, yet necessarily intertwined elements: The party invoking the court's authority must demonstrate (1) "some actual or threatened injury" that (2) "fairly can be traced to the challenged action" and (3) "is

likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. at 472, 102 S.Ct. at 758 (*quoting Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450 (1976), respectively). *See also Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed. 2d 556 (1984).

The first of these elements, that a party "has been or will in fact be perceptibly harmed by the challenged agency action," *see United States v. SCRAP*, 412 U.S. at 688, 93 S.Ct. at 2416, is the core of standing. *National Wildlife Federation v. Hodel*, 839 F.2d 694, 704 (D.C.Cir.1988). The requisite injury, however, cannot be to merely "abstract" interests. *See Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986); *Simon*, 426 U.S. at 40, 96 S.Ct. at 1925; *Sierra Club*, 405 U.S. at 739–740, 92 S.Ct. at 1368–69.

The second element is causation: the injury alleged must be "fairly traceable" to the challenged action. The Supreme Court has indicated that indirectness of causation is not necessarily a barrier to standing. *See Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (environmental group had standing to challenge limitation on utility liability in event of nuclear accident); *see also Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (whale watching group had standing to challenge failure of Secretary of Commerce to cite Japan for violations of international limitations on harvesting of whales).

The third and final element of standing analysis is redressability. Differentiating "[t]he 'fairly traceable' and 'redressability' components of the constitutional standing inquiry," the Supreme Court observed that the causality inquiry "examines the causal connection between the [defendant's—here, the BLM's] assertedly unlawful conduct and the alleged injury" while the redressa-

bility inquiry "examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3326 n. 19. In this case, the "redressability" requirement therefore demands that Nevada demonstrate that there is a "substantial likelihood" that the relief requested would preclude the BLM from issuing at some future date, the ROWR to the DOE, in accordance with the NWPA and the FLPMA. *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20.

In addition, the courts have imposed standing limitations beyond those required by the Constitution. These prudential limitations arise from a concern that the courts not "be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206.

Hence, the courts have held that when the alleged harm is a "generalized" or "abstract" grievance shared by a large class of citizens, jurisdiction will not be exercised. *Western Mining Council v. Watt,* 643 F.2d 618, 623 (9th Cir.1981), *citing Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205; *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Ex Parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

## NEVADA FAILS TO DEMONSTRATE ACTUAL INJURY

The case or controversy requirement of Article III, which limits the jurisdiction of the federal courts, also applies to actions under the Declaratory Judgments Act, 28 U.S.C. § 2201. *Western Min. Council v. Watt,* 643 F.2d at 623; *Stewart v. M.M. & P. Pension Plan,* 608 F.2d 776, 782 (9th Cir.1979). Accordingly, the requirements for standing and justiciability apply to an action, such as Nevada's, for declaratory judgment. Thus, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Western Min. Council v. Watt,* 643 F.2d at 624, *quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

▮ To satisfy the first element of the standing requirement, Nevada must allege some threatened or actual injury resulting from the BLM's granting of the ROWR to the DOE. Nevada's Complaint contains no averments that the State uses the public lands adjacent to Yucca Mountain for any purpose. Instead, Nevada contends that the BLM's grant of the ROWR to the DOE contravenes FLPMA. In effect, Nevada's first, third, and fourth causes of action constitute a generalized grievance that the BLM is not acting in a way in which the State maintains is in accordance with FLPMA and the Constitution.[7]

▮ In more specific terms, Nevada's Complaint includes an allegation that site characterization can disturb the surface and subsurface of the public lands in the affected area, and with other uses. (# 1, ¶ 1.14, at 7–8). Inasmuch as the area to be affected by the site characterization is public land administered by the BLM, Nevada has not indicated any proprietary or sovereign interests in such public lands.

---

7. This particular allegation does not, as a matter of law, confer standing upon Nevada. In *Allen v. Wright,* 468 U.S. at 754, 104 S.Ct. at 3326, the Supreme Court maintained:

> This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.... "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning."
> (Citations omitted).

Beyond this, in the most generalized terms, Nevada contends in its Opposition to the BLM's Motion to Dismiss (though not in its Complaint) that grave consequences shall befall the State and its citizens if, at the culmination of the NWPA process, Yucca Mountain is indeed utilized as a repository.[8]

The Court does not discount or minimize the concerns expressed by Nevada, but recognizes as well that the NWPA process is not complete and no final determination has yet been made as to the utilization of Yucca Mountain as a repository. Nevada's allegations of potential harm are, however, at this time insufficient to establish that the State of Nevada has or will subject to actual injury due to the BLM's action permitting the DOE to proceed with site characterization studies at Yucca Mountain.[9]

Indeed, the Supreme Court has held that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205. Similarly, in the context of a state taxpayer challenge to federal statutes in *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1956, 20 L.Ed.2d 947 (1968), the Supreme Court noted that standing requirements exist so that courts will not be asked to adjudicate "generalized grievances about the conduct of government or the allocation of power in the Federal System."

■ Nevada further alleges that its interests have been sacrificed at the alter of political expediency by the elected representatives of her sister states, inasmuch

that if the nuclear waste repository is eventually established at Yucca Mountain, the citizens of Nevada will be at a disproportionate risk of accident. That a particular federal law, the NWPA in this case, affects Nevada more significantly than her sister states (some of which might not be affected at all), is insufficient to sustain standing.

Allegations of a federal statute's disproportionate impact has been considered before in this circuit in the context of standing requirements. In *Western Min. Council v. Watt*, 643 F.2d 618 (9th Cir.1981), *supra* various plaintiffs sought a declaratory judgment rendering all or part of the FLPMA unconstitutional. The plaintiffs argued that since some states contain less public land than does California, the FLPMA injured them as California taxpayers because it restricted California's tax base, causing an increase in the amount of taxes which plaintiffs had to pay. *Id.* at 630.

The Ninth Circuit panel affirmed the district court's dismissal for failure to state a claim upon which relief could be granted, on the grounds that the plaintiffs lacked standing:

The increase in state taxes allegedly suffered by plaintiffs is at best a *highly generalized injury*. A great many federal statutes potentially affect the level of state taxes. Here, plaintiffs' interest in the effect of the retention and reimbursement policies [regarding the administration of public lands pursuant to FLPMA] on state taxes is shared in somewhat differing degrees by the taxpayers of all states which contain public

---

8. Cited as "specific examples of direct injury to Nevada's sovereign and quasi-sovereign interests," Nevada discusses the polarization of the population and political infrastructure, and the potentially negative influence a repository would have on the state's image as a tourist destination. (# 19 at 26–27)

9. The BLM's Reply Memorandum cogently responds to Nevada's "specific examples" as follows:

Each [example of "direct injury"] lacks any referent [sic] in the Complaint.... The first example also apparently presumes that Nevada's sovereign and quasi-sovereign interests

encompass political unanimity among its citizens and institutions. The absence of authority for the proposition is telling. The second example depends upon the existence of a repository. But BLM's decision only authorizes DOE to occupy, use and develop the public lands to study their characteristics for a site. If and when a repository may be built is numerous decisions away, *all to be made by agencies and institutions other than the BLM*. The harm averred, thus, lacks any causality to the [BLM] decision in question. (# 21, at 25–26, n. 5) (emphasis added).

lands. We hold that this interest is insufficient to give plaintiffs standing to challenge the constitutionality of [the FLPM]. *We do not sit to pass judgment on congressional declarations of policy which affect plaintiffs only in an attenuated and generalized way. Plaintiffs must look to the legislative branch for redress of such generalized grievances. Id.* at 632 (emphasis added).

In conclusion, even assuming *arguendo,* that the BLM's action is violative of the FLPMA and/or the NWPA, Nevada has nonetheless failed to demonstrate "actual injury" that is "fairly traceable" to the challenged conduct and "likely to be redressed by the requested relief." The only direct consequence flowing from the complained BLM action is that the site characterization process will proceed to the next step in accordance with the NWPA.[10] Any potential risks which may be created by the eventual establishment of a nuclear waste repository at Yucca Mountain will be justiciable, if at all, following the completion of all preliminary studies conducted and all procedural steps undertaken, pursuant to the NWPA.

## NEVADA'S PARTICIPATION RIGHTS UNDER THE NWPA INSUFFICIENT TO CONFER STANDING TO CHALLENGE BLM ACTION

■ Nevada asserts that its oversight role under the NWPA confers standing to insist that the BLM perform its duties according to the applicable statutes. Nevada's Complaint does not allege a violation of the NWPA. Rather, Nevada asserts that the BLM's grant of the ROWR to the DOE violated the FLPMA, which in turn, prejudices Nevada's oversight role as provided for in the NWPA. This contention is without merit.

This Court is cognizant of *Nevada ex rel. Loux v. Herrington,* 777 F.2d 529 (9th Cir. 1985) ("*Nevada I*"), which held that Nevada had standing to contest DOE's decision

to deny funding for Nevada's expenditures on studies designed to evaluate whether Yucca Mountain should be used as a repository, and declared unlawful DOE's guidelines on site characterization phase grants. The decision is not, however, inconsistent with the BLM's contention that Nevada lacks standing to seek declaratory relief in this action.

In *Nevada I,* DOE denied funding for Nevada's proposed site characterization studies for fiscal year 1985, relying on internal guidelines authorized by the NWPA. The Ninth Circuit panel appropriately noted that the NWPA authorized funding for state studies as soon as the state had been notified that it hosts a potential site. *Nevada I,* 777 F.2d 529 at 533, *citing* 42 U.S.C. § 10121(b). The denial of such federal funds therefore had a "direct and immediate" effect on Nevada's testing activities, "discouraging the state from embarking on the lengthy and detailed independent site studies that would allow it to fully evaluate DOE's conclusions." *Id.,* at 535. The court concluded that the denial of funds created a dilemma not contemplated by the NWPA:

The state must therefore choose now between "disadvantageous compliance and risking sanctions,"—either to restrict its testing to those forms which would be funded under the Guidelines even though its evaluation of DOE's studies would thereby be impaired, or to perform such testing at its own expense. Resolution of the Guidelines now will foster, rather than impede, effective administration of the Fund by DOE since DOE's decision to fund the states' ongoing budget requests will necessarily be controlled by the challenged Guidelines.

*Id.,* (citations omitted).

No such "Hobson's choice" confronts Nevada in this case. The BLM's action at issue here is simply a step in the site characterization process authorized by the

---

**10.** The site characterization at Yucca Mountain must proceed according to the procedural scheme established by the NWPA, which provide for the State of Nevada opportunities to monitor the process, provide input, make rec-

ommendations, receive financial assistance, and appeal. 42 U.S.C. §§ 10134–10137. In sum, numerous steps mandated by the NWPA prior to the establishment of a repository at Yucca Mountain have yet to commence.

NWPA. The BLM grant of the ROWR to the DOE does not preclude Nevada from conducting any activity authorized by the NWPA. If the BLM's action precluded Nevada from participating in the site characterization process, Nevada might well have standing to argue deprivation of its statutory rights. However, the BLM's grant of the ROWR to the DOE does not have any effect that even remotely prejudices Nevada's right to conduct its own site studies. As such, the BLM's action cannot be construed as prejudicing Nevada's statutory participation rights in the repository siting process.

Indeed, in *Nevada v. Herrington*, 827 F.2d 1394 (9th Cir.1987) ("*Nevada II*"), which cogently summarizes the potential host state's "cooperative and concurrence role" in the repository siting process pursuant to the NWPA, *Id.* at 1397, the Ninth Circuit denied several states' (including Nevada's) petition for review of the DOE's decision that states could not use grant monies from the Nuclear Waste Fund to finance their participation in judicial review proceedings pursuant to the NWPA:

> The states contend that the language of section 10136 ["Participation of States"] itself mandates funding for judicial review because on its face it authorizes funding of "review" of [DOE's] activities under the [NWPA]. When we look to the context of the word "review," however, we find the more plausible construction of the word is that it is limited to a state's independent evaluation of siting activities and does *not encompass a court's review.* Section 10136(c)(1)(B) sets forth an exhaustive list of activities for which a state may use grant funds. The express language of this section provides that ["the Secretary shall make grants to the State of Nevada and any affected unit of local government for the purpose of enabling such State or affected unit of local government]—(i) to review activities taken under [this part (of

the NWPA) with respect to the Yucca Mountain site."] Our interpretation of this provision as *limited to state review rather than federal court review* is consistent with the other enumerated activities specified in the section; activities involving [Nevada's] information gathering, evaluation, and dissemination to its residents. As we stated in *Nevada I*, the NWPA's state participation provisions authorized "independent oversight and peer review" by states. Neither the language of section 10136 nor its legislative history makes any reference to *judicial review.*

> The states also contend that funding for judicial review is mandated by section 10137(c)(11). That section provides that the consulation and cooperation agreement must specify procedures for resolving a state's objections "through negotiation, arbitration, or other appropriate mechanisms." Petitioners argue that "other appropriate mechanisms" include judicial review. This contention also fails.

> . . . . .

> This is not to say that the states have no access to the courts. Congress provided for judicial review in section 10139 of the [NWPA] and the states are free to challenge DOE's actions pursuant to this provision.

> *Id.* at 1399, 1400 (footnote, citation omitted) (emphasis added).[11]

Nevada's Complaint contains no allegations that the BLM acted to deny Nevada any funds authorized by the NWPA. Morever, *Nevada I* and *Nevada II* clearly indicate that the "cooperative and concurrence role" in the site characterization program codified in the NWPA does not permit Nevada, as the potential host state of the repository, to stop the site characterization process. Rather, the terms of the NWPA indicate that Congress intended a parallel system of state and federal monitoring and

**11.** The Nuclear Waste Policy Act Amendments of 1987, replaced, *inter alia,* the general reference "each State in which a candidate site for a repository is approved" with "the State of Nevada and any affected unit of local government.

This change reflects the Congressional intent to focus on the Yucca Mountain site. This court sees nothing in the Amendments which would indicate a change in the Ninth Circuit's rationale in *Nevada II.*

planning, which could culminate in the establishment of a repository at Yucca Mountain.[12]

In sum, if the BLM's action precluded Nevada from participating in the site characterization process, Nevada might well have standing to argue deprivation of its statutory rights. The BLM's grant of the ROWR to DOE does not, however, prejudice Nevada's right to conduct its own site studies. As such, the BLM cannot be construed as acting to obstruct Nevada's statutory participation rights in the repository siting process.

### RIGHT–OF–WAY APPLICATION OF MIFLIN & ASSOCIATES IS NOT RIPE

■ Nevada's second cause of action seeks an order compelling the BLM to grant a right-of-way permit to Miflin & Associates, the private firm retained by Nevada to conduct analysis of Yucca Mountain as a repository. Miflin's application for a right-of-way across the public lands adjacent to Yucca Mountain is dated September 30, 1987. Miflin subsequently acknowledged by letter dated April 25, 1988, that its application was deficient, as pointed out by the BLM in previous correspondence. The BLM is currently considering Miflin's corrected application.

There has been no final administrative action on the part of the BLM. The correspondence through which the BLM notified Miflin of the deficiencies in its application, even if classified as interlocutory procedural rulings, is not reviewable. Premature review could lead this Court to unnecessarily entangle itself "in abstract disagreements over administrative policies" or unnecessarily interfere with agency decision-making before the "decision has been formalized and its effects felt in a concrete way by the challenging parties." *Maine v. Herrington*, 790 F.2d 8, 9 (1st Cir.1986), *quoting Abbott Laboratories v. Gardner*,

387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

Any order by this Court concerning the processing of Miflin's application for right-of-way would interfere with, if not preempt, the BLM's decision-making process. *See State of Cal. Dept. of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir.1987). Therefore, the Court finds that Nevada's second cause of action is not ripe for judicial review.

### NO VIOLATION OF NEVADA'S CONSTITUTIONAL RIGHTS

■ Nevada's third and fourth causes of action assert that the BLM's grant of the ROWR to the DOE, in the face of Nevada's stated disapproval, violates the equal footing doctrine, infringes upon the State's sovereignty, and thereby infringes on Nevada's rights reserved under the Tenth Amendment. Nevada fails, however, to state a claim upon which relief can be granted.

The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., Art. IV, § 3, cl. 2. The Supreme Court has "repeatedly observed" that "'[t]he power over the public land thus entrusted to Congress is without limitations.'" *Kleppe v. New Mexico*, 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976), *quoting United States v. San Francisco*, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940).

This does not mean, however, that the Property Clause exempts public lands from all state regulation. As the Court in *Kleppe* explained:

> Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to *enact legislation* respecting those lands pursuant to the Property Clause. *And when*

---

**12.** While the allegations that Miflin and Associates are being unlawfully denied access to Yucca Mountain do implicate a possible violation of Nevada's statutory participation rights codified at 42 U.S.C. §§ 10131, 10136, and 10137, Nevada's second cause of action is not yet ripe. (See discussion below.)

*Congress so acts*, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

426 U.S. at 543, 96 S.Ct. at 2293 (citations omitted)

(emphasis added).

Inasmuch as the BLM is authorized, indeed required, pursuant to the NWPA, to facilitate the site characterization of Yucca Mountain, it is likewise authorized, in accordance with the FLPMA, to grant a permit to the DOE, a sister federal agency with access for such Congressionally mandated purposes. Consequently, Nevada's approval is not, as a matter of law, necessary.[13]

As a final matter, Nevada asserts that the NWPA Amendments of 1987, which designate Yucca Mountain as the only site to be studied by the DOE, arose out of a political conspiracy between the BLM, the DOE and Congress designed to isolate Nevada and render it the unwilling host of the repository. Consequently, Nevada argues, the BLM's grant of a ROWR to DOE is the fruit of the conspiracy, thereby enabling Nevada to assert a claim for relief based on deprivation of the equal footing doctrine and the Tenth Amendment.

Nevertheless, it is well established that the Tenth Amendment limits on Congress' authority to regulate state activities are "structural, not substantive—i.e., that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *South Carolina v. Baker,* —— U.S. ——, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988), *citing Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 537–554, 105 S.Ct. 1005, 1010–1019, 83 L.Ed.2d 1016 (1985).

In *South Carolina v. Baker,* the state contended that the political process failed because Congress enacted a provision to the Internal Revenue Code which adversely affected state and local government bonds. In rejecting this argument, the Supreme Court stated:

> Although *Garcia* left open the possibility that some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment, the Court in *Garcia* had no occasion to identify or define the defects that might lead to such invalidation. Nor do we attempt any definitive articulation here. It suffices to observe that South Carolina has not even alleged that it was deprived of any right to participate in the national political process or that it was singled out in a way that left it politically isolated and powerless.... *[N]othing in Garcia or the Tenth Amendment authorizes courts to second-guess the substantive basis for congressional legislation.* Where, as here, the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated. 108 S.Ct. 1355 at 1360–61

(emphasis added).

In this case, Nevada asserts that it was singled out by a political conspiracy "render[ing] Nevada, a politically weak state, defenseless to the interests of the other 49 states...." (# 1, ¶ 3.2, at 10). Nevada offers as proof of this alleged conspiracy the fact that no member of its congressional delegation was present at certain committee meetings at which the NWPA Amendments of 1987 were promulgated. There is no indication, however, that Nevada lawmakers were inappropriately *denied* the opportunity to contribute input or otherwise participate. Consequently, this court cannot conclude that the promulgation of national legislation affecting one state in a particular manner is sufficient to establish an "extraordinary

13. Nevada's claim that the BLM's decision "seriously diminish[es]" its "equal footing and Tenth Amendment rights" is likewise without merit. (Complaint, # 1 ¶ 3.2 at 10–11). The BLM's Motion to Dismiss discusses this adequately (# 15 at 59–66), and this Court only emphasizes Nevada's Statehood Act of 1864, in which the then territory of Nevada declared to "forever disclaim all right and title to the unappropriated public lands lying within said territory." 13 Stat. 30 (1864)

defect in the national political process," sufficient to implicate a violation of the Constitution.[14]

## CONCLUSION

This court must concur with the BLM's summation of its Motion to Dismiss, which boils down Nevada's Complaint to its essence:

[n] judicial opinion exists holding that the Congress' power to decide when, where, how and whom may use the public lands is so coterminous with a state's sovereignty that the federal government's needful regulation must, as a matter of constitutional law, depend upon a state's consent. Consequently, Nevada may not abrogate its binding agreement [Statehood Act] forever disclaiming any right to interfere with Congress' needful regulation of the public lands. Neither under the equal footing doctrine with the other states, nor otherwise, does Nevada have any right reserved to it that requires the BLM to obtain the state's consent before allowing the Department of Energy to occupy and use public lands for a purposes Congress itself mandates. BLM's Motion to Dismiss (#15 at 66).

IT IS THEREFORE ORDERED THAT the State of Nevada's Complaint (#1) is DISMISSED.

---

**14.** Moreover, Nevada's challenge under the Tenth Amendment is directed solely at the NWPA Amendments of 1987, which designate Yucca Mountain as the sole study site. Consequently, this court is without jurisdiction, since Congress vested original and exclusive jurisdiction over such matters arising under the NWPA with the courts of appeal. 42 U.S.C. § 10139(a)(1)(C) (1982); *General Elec. Uranium v. U.S. Dept. of Energy,* 764 F.2d 896, 901–02 (D.C.Cir.1985).