777 F.2d 529
 23 ERC 1617, 54 USLW 2323, 16 Envtl.
L. Rep. 20,165
 STATE OF NEVADA, ex rel., Robert R. LOUX, Director of the
Nevada Nuclear Waste Project Office, Petitioner,
v.
John HERRINGTON,* Secretary of the United States
Department of Energy, Respondent.
 CA No. 84-7846.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 12, 1985.
Decided Dec. 2, 1985.
 
 Malachy R. Murphy, James H. Davenport, Olympia, Wash., Harry W. Swainston, Dep. Atty. Gen., Carson City, Nev., for petitioner.
 
 
 1
 Kenneth O. Eikenberry, Atty. Gen., Charles B. Roe, Jr., Sr. Asst. Atty. Gen., Charles W. Lean, Asst. Atty. Gen., Olympia, Wash., amicus curiae, for State of Wash.
 
 
 2
 Jim Mattox, Atty. Gen. of Tex., David R. Richards, Executive Asst. Atty. Gen., Ben F. McDonald, Energy & Env. Protection Div., Renea Hicks, Asst. Atty. Gen., Austin, Tex., for State of Tex.
 
 
 3
 Hubert H. Humphrey, III, Atty. Gen., St. Paul, Minn. Jocelyn Furtwangler Olson, Sp. Asst. Atty. Gen., Roseville, Minn., for State of Minn.
 
 
 4
 David L. Wilkinson, Atty. Gen., Fred Nelson, Asst. Atty. Gen., Michael M. Later, Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah, for State of Utah.
 
 
 5
 Martin W. Matzen, Dept. of Justice, Washington, D.C., for respondent.
 
 
 6
 Michael A. Bauser, Jill E. Grant, Newman & Holtzinger, P.C., Washington, D.C., for Utilities.
 
 
 7
 On Petition for Review under the Original Jurisdiction of the Court of Appeals.
 
 
 8
 Before MERRILL and FARRIS, Circuit Judges, and JAMESON,** District Judge.
 
 OPINION
 FARRIS, Circuit Judge:
 STATEMENT OF THE CASE:
 
 9
 Nevada seeks funding of technical studies designed to evaluate whether its Yucca Mountain site should be used as a nuclear waste repository. Nevada also seeks a judgment declaring unlawful the Department of Energy's revised Internal General Guidelines on Nuclear Waste Repository Program Grants. This case is a direct appeal from the Secretary of Energy's final decision to deny funding for Nevada's FY 1985 expenditures on Yucca Mountain studies. See 42 U.S.C. Sec. 10139(a)(1)(A).
 
 
 10
 The Nuclear Waste Policy Act of 1982 (NWPA), Pub.L. No. 97-425, Jan. 7, 1983, 42 U.S.C. Secs. 10101-10226, provides that state activities related to the selection and construction of a high-level nuclear waste repository will be funded out of the Nuclear Waste Fund, which is derived from a levy on nuclear waste generators and owners. A state first becomes eligible for funding when it is notified by DOE that it contains a potential repository site. See Sec. 116(c)(1)(A), 42 U.S.C. Sec. 10136(c)(1)(A). Nevada has been so notified. The Act then requires the Secretary to nominate at least five sites as suitable for "site characterization"--i.e., detailed research of the geologic conditions surrounding the site--accompanied by an environmental assessment. See Sec. 112, 42 U.S.C. Sec. 10132. After public hearings and state and Indian tribe input, the Secretary must recommend three of these sites to the President. Sec. 112(b)(1)(B), 42 U.S.C. Sec. 10132(b)(1)(B). The President may approve or disapprove the recommendations within 60 days. Sec. 112(c)(1), 42 U.S.C. Sec. 10132(c)(1).
 
 
 11
 The Secretary has not yet nominated any sites, even though he has taken the discretionary step of issuing nine draft environmental assessments on potential sites in six states. These drafts indicate that three sites are likely to be nominated to the President later this year; Yucca Mountain in Nevada is listed as the most likely site for approval.
 
 
 12
 On September 17, 1984, Nevada applied for a grant from the Fund for proposed hydrologic and geologic studies of the Yucca Mountain area. On December 13, DOE refused to fund these studies, amounting to a disputed sum between $1.5 and $2.2 million. DOE relied on the authority of its Internal General Guidelines, which seek to "minimize" primary data collection by states and limit state evaluation of any primary data already collected by DOE.
 
 
 13
 The next day, Nevada timely filed its petition for review to this court, see 42 U.S.C. Sec. 10139(c), first seeking a preliminary injunction which we denied on December 19, and then asking for approval of its grant request and a declaration that the Guidelines are unlawful.[1]
 
 
 14
 I. Standard of review.
 
 
 15
 In reviewing the Guidelines, we do not "simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); see General Electric Uranium Mgmt. Corp. v. United States Department of Energy, 764 F.2d 896, 898 (D.C.Cir.1985) (reviewing Nuclear Waste Policy Act); State of Washington, Dept. of Ecology v. EPA, 752 F.2d 1465, 1469 (9th Cir.1985). The "considerable weight" given an agency's interpretation of its own regulations is heightened when the agency is implementing, as here, a new statute. See Udall v. Tallman, 380 U.S. 1, 18, 85 S.Ct. 792, 802, 13 L.Ed.2d 616 (1965); NRDC, Inc. v. Train, 510 F.2d 692, 706 (D.C.Cir.1975).
 
 
 16
 We "must, however, reject administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." United States v. Louisiana-Pacific Corp., 754 F.2d 1445, 1447 (9th Cir.1985); see Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).II. Is the state entitled to funding of its pre-site characterization activities?
 
 
 17
 Nevada seeks funding of all activities "relevant" to the purposes of the NWPA--so long as they do not "unreasonably interfere" with DOE's activities--during the period preceding the selection of Nevada for site characterization activities.
 
 
 18
 A. The purposes of the Act.
 
 
 19
 The findings and general purposes of the NWPA support funding of pre-site characterization activities. Cf. Complaint of McLinn, 744 F.2d 677, 683 (9th Cir.1984) ("a liberal construction of the statute is indicated by its declaration of policy"). The statute declares that the costs of nuclear waste disposal "should be the responsibility of the generators and owners of such waste," 42 U.S.C. Secs. 10131(a)(4), 10131(b)(4)--and at the same time, state and public participation in the planning of waste sites "is essential [to] promote public confidence," 42 U.S.C. Sec. 10131(a)(6). Taken together, these dual purposes show that Congress intended the generator-fed Nuclear Waste Fund, not the state, to pay the costs of any state "participation"--such as evaluative testing--in the choice of sites. The independent oversight and peer review which only the states are poised to provide would immeasurably "promote public confidence" in general and among Nevada residents in particular.
 
 
 20
 These studies would also promote the statutory purpose of "provid[ing] a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste," 42 U.S.C. Sec. 10131(b)(1). When the statute repeatedly states that the protection and confidence of the public are goals of the NWPA, see id.; 42 U.S.C. Sec. 10131(a)(1), (4), (7), we must conclude that Congress contemplated funding independent state studies even if they are instituted prior to formal site characterization.
 
 
 21
 As the Act recognizes, the dangers inherent in nuclear waste disposal mandate a close, independent scrutiny of DOE's siting decisions. Some of the nuclear isotopes involved will generate intense radioactivity and heat for tens of thousands of years. The site which is ultimately selected must therefore remain secure for the indefinite future. Cursory evaluation of potential sites today can result in heightened danger and potentially prohibitive control costs tomorrow.[2]
 
 
 22
 B. The structure of the Act.
 
 
 23
 Funding is also supported by the principle that a "statute should be construed so as to avoid making any word superfluous." E.g., United States v. Handy, 761 F.2d 1279, 1280 (9th Cir.1985); Yamaguchi v. State Farm Automobile Insur. Co., 706 F.2d 940, 946 (9th Cir.1983). The statute's core funding provision, Sec. 116(c)(1)(A), requires grants "to each State notified under subsection (a) for the purpose of participating in activities required by sections 116 and 117 or authorized by written agreement." (Emphasis added); see 42 U.S.C. Sec. 10136(c)(1)(A). But other provisions already specifically require grants to states when the President has chosen a candidate site, Sec. 116(c)(1)(B), when the Nuclear Regulatory Commission has authorized construction, Sec. 116(c)(2)(A), and when the state and DOE have entered into a written cooperative agreement, Sec. 117(c). 42 U.S.C. Secs. 10136(c)(1)(B), 10136(c)(2)(A), 10137(c). To avoid treating section 116(c)(1)(A) as superfluity, it must be read as a catchall provision that authorizes funding in other circumstances not already specifically "required by sections 116 or 117 or authorized by written agreement."Section 116(c)(1)(A) thus provides a basis for funding Nevada's proposed studies, if those studies would be essential to an informed "statement of reasons explaining why [the state] disapproved the recommended repository site." Sec. 116(b), 42 U.S.C. Sec. 10136(b)(2). That statement of reasons is "required by section 116." Hence, subject to certain limitations, the studies must be funded in compliance with Sec. 116(c)(1)(A).[3]
 
 
 24
 DOE argues that Congress only intended to trigger federal funding after a state has entered the site characterization phase. To authorize funding prior to site characterization, DOE contends, "would clearly divert moneys from the Nuclear Waste Fund to premature site characterization activities on sites which might not become candidates at all."
 
 
 25
 This argument, perhaps valid in some circumstances, is inapposite here. DOE's own press conferences and draft environmental assessments list Yucca Mountain as the most likely site for the repository, thus minimizing the danger that funding for Nevada's studies will be "wasted." More important, DOE's argument misses the point of the NWPA. Congress intended all the costs of nuclear waste disposal to be "the responsibility of the generators and owners of such waste." 42 U.S.C. Secs. 10131(a)(4), 10131(b)(4). The statute thus provides funding for evaluating all three of the sites nominated for site characterization--despite the fact that only one of the three sites will ultimately become the national repository. See 42 U.S.C. Secs. 10132(c), 10134. By the same token, when an informed "statement of reasons" for disapproving a recommended site requires that studies be initiated now, the costs of those studies must be borne by the Nuclear Waste Fund--even though a state may never have to file such a statement of reasons because the state is later eliminated from contention. In the context of developing repositories for waste from nuclear defense activities, Congress has authorized funding for state studies as soon as they have been notified that they host a potential site. See 42 U.S.C. Sec. 10121(b). Because the statute declares that the states' participation rights for defense waste repositories are "identical to" those at issue here, id., federal funding was intended to be available under Sec. 116(c)(1)(A) even before site characterization has begun.
 
 
 26
 Our interpretation of the statute is supported by the legislative history of the Senate predecessor bill, which indicates that states "should be entitled to the broadest possible rights and opportunities to participate in the development of the facilities.... The Committee expects this fundamental principle to govern any interpretation, including judicial interpretations...." S.Rep. No. 282, 97th Cong., 1st Sess. 28 (1981). Furthermore, the fact that Sec. 116(c)(1)(A) was added in the final conference committee deliberations to a bill that throughout several versions had provided only for post-site characterization, see Sec. 116(c)(1)(B), 42 U.S.C. Sec. 10136(c)(1)(B), indicates that Sec. 116(c)(1)(A) was intended to fill the gap and supply funding prior to site characterization, rather than merely repeat the specific funding authority already set out by other provisions. The amendment specifically excludes from federal funding "any salary or travel expense that would ordinarily be incurred by such State." Sec. 116(c)(1)(A), 42 U.S.C. Sec. 10136(c)(1)(A). This language suggests by negative implication that other state expenses required by sections 116 or 117--such as testing expenditures--are to be funded by the Nuclear Waste Fund.
 
 
 27
 Of course, the state is not entitled to carte blanche access to the Nuclear Waste Fund. The only pre-site characterization activities that may receive funding are those essential to an informed "statement of reasons" for disapproving a site under Sec. 116(b). Section 116(c)(1)(B) already authorizes funding for "any monitoring, testing, or evaluation" after site characterization has begun. If Sec. 116 (c)(1)(A) is to have any independent effect, it must authorize only those studies which, to be available in time to contribute to the state's notice of disapproval, must be begun prior to site characterization. Therefore, pre-site characterization activities may only receive funding if their contribution to the state's notice of disapproval depends on their being initiated prior to site characterization.
 
 
 28
 Congress has limited funding under a consultation-cooperation agreement to only such "reasonable independent monitoring and testing" which "shall not unreasonably interfere with or delay onsite activities." See Sec. 117(c)(8), 42 U.S.C. Sec. 10137(c)(8). As Nevada concedes, this provision indicates that Congress only intended to fund "reasonable" state testing that would not "unreasonably interfere with or delay" DOE's activities. Therefore, any pre-site characterization activities conducted before a state has entered into a consultation-cooperation agreement must be "reasonable"--scientifically justifiable and performed by demonstrably competent contractors--and cannot unreasonably interfere with or delay DOE's own activities.
 
 
 29
 III. Review of the site characterization Guidelines.
 
 
 30
 Apart from the question whether the statute authorizes funding for pre-site characterization activities, both parties petition us to decide whether the Guidelines are consistent with the statutory scheme of funding available after a state has reached the site characterization stage. Before deciding this issue, however, we must determine whether Nevada has standing and whether the issue is ripe for adjudication.
 
 
 31
 A. Standing.
 
 
 32
 Nevada arguably lacks standing to contest the Guidelines governing the site characterization phase because 1) Nevada has not yet entered the site characterization stage, and 2) the Secretary may never even recommend the Yucca Mountain site in Nevada for site characterization. On the other hand, DOE has already denied funding for Nevada's proposed FY 1985 studies, by first categorizing those studies as Phase III site characterization studies, and then applying the Phase III Guidelines to deny funding. Thus, Nevada has suffered "some actual or threatened injury" as a direct result of DOE's own application of the Phase III Guidelines. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). It would be disingenuous for DOE to argue that Nevada lacks standing to challenge the very guidelines that DOE has chosen to apply to Nevada.
 
 
 33
 Because Nevada has alleged "personal injury" that is "fairly traceable" to the challenged conduct and "likely to be redressed by the requested relief," see, e.g., Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); Price v. State of Hawaii, 764 F.2d 623, 630 (9th Cir.1985), the state has standing to challenge DOE's Phase III site characterization Guidelines.
 
 
 34
 B. Ripeness.
 
 
 35
 Similar reasoning indicates that Nevada's challenge is ripe for adjudication. The "basic rationale" of the ripeness doctrine is to prevent courts from "entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n, 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). The question of ripeness turns on " 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' " 461 U.S. at 201, 103 S.Ct. at 1720 (quoting Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515).
 
 
 36
 Consistent with the trend in favor of reviewing even policy statements and informal positions, letters, or announcements, see 4 K. Davis, Administrative Law Treatise Sec. 25.16 at 411 (2d ed. 1983), we will review the challenge to DOE's Guidelines. The validity of the Phase III Guidelines is a purely legal issue involving a reading of congressional intent rather than complex factual questions. See Pacific Gas, 461 U.S. at 201, 103 S.Ct. at 1720; Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515. Second, the Guidelines bear hallmarks of finality, an element of ripeness that the Supreme Court has viewed in a "pragmatic way." Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1516. While not formally adopted by DOE under the Administrative Procedure Act, the Guidelines were issued in both draft and revised form to all relevant states and Indian tribes, and in DOE's own words, "express the administrative construction of the NWPA that subsequently formed the basis for DOE's partial denial of Nevada's grant request." Compare with Administrative Procedure Act, 5 U.S.C. Secs. 551(4), (13) (agency action includes "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy") (cited in Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1516). Because the Guidelines by their own terms "are intended to assist field offices by establishing a single framework within which grants can be negotiated and awarded," (emphasis added), they can be viewed as "a definitive statement of the agency's position." See Air California v. United States Dept. of Transp., 654 F.2d 616, 620 (9th Cir.1981).
 
 
 37
 Even if the Guidelines are viewed "as a statement only of [DOE's] intentions," they are eligible for review. See, e.g., Abbott Laboratories, 387 U.S. at 150, 87 S.Ct. at 1516, citing Columbia Broadcasting System v. United States, 316 U.S. 407, 418-19, 62 S.Ct. 1194, 1201, 86 L.Ed. 1563 (1942); K. Davis, supra, at Sec. 25.15 (collecting cases). Their effect on the state's testing activities is "direct and immediate," see Air California, 654 F.2d at 621, discouraging the state from embarking on the lengthy and detailed independent site studies that would allow it to fully evaluate DOE's conclusions. The state must therefore choose now between "disadvantageous compliance and risking sanctions," K. Davis, supra, at Sec. 25.13; see Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. at 1517--either to restrict its testing to those forms which would be funded under the Guidelines even though its evaluation of DOE's studies would thereby be impaired, or to perform such testing at its own expense. Resolution of the Guidelines now will foster, rather than impede, effective administration of the Fund by DOE, see State of Texas v. United States Department of Energy, 764 F.2d 278, 283 (5th Cir.1985), since DOE's decision to fund the states' ongoing budget requests will necessarily be controlled by the challenged Guidelines.
 
 
 38
 In sum, although Nevada has not yet entered the site characterization stage, it has already suffered a direct and immediate injury from DOE's application of its formal, final Guidelines. Furthermore, because DOE has indicated in both its draft environmental assessments and in public statements that Nevada's Yucca Mountain site is likely to top the list of sites recommended for site characterization in fall of 1985, a challenge to those Guidelines is ripe for review.
 
 
 39
 C. The Guidelines unduly restrict the state's statutory rights.
 
 
 40
 Nevada challenges two clauses in the Guidelines. These declare that "duplication of data collection efforts and associated activities should be minimized to the maximum extent practicable and avoided if at all possible," and that Nevada may "receive funding to run independent tests on DOE data, where the need for such independent testing can be justified." The first clause minimizes primary data collection by the state; the second clause requires DOE approval before a state may obtain funding for any tests--even though those tests are confined to primary data already collected by DOE.
 
 
 41
 This interpretation of a state's statutory rights is unduly restrictive. Section 116(c)(1)(B)'s mandatory language provides that the Secretary "shall make grants to each state ... to engage in any monitoring, testing, or evaluation activities with respect to site characterization." 42 U.S.C. Sec. 10136(c)(1)(B) (emphasis added). As the legislative history indicates, these grants "extend[ ] to all activities undertaken under this subtitle," H.R.Rep. No. 785, 97th Cong., 2d Sess. 72 (1982); the House reports impose no limitation on the state's funding of the type adopted in the Guidelines. See H.R.Rep. No. 491, Pt. 1, 97th Cong., 2d Sess. 55 (1982), reprinted in 1982 U.S.Code Cong. & Ad.News 3792, 3821. See also Sec. 117(c)(8), 42 U.S.C. Sec. 10137(c)(8) (state may conduct "reasonable independent monitoring and testing of activities on the repository site" pursuant to a written agreement during the site characterization stage).
 
 
 42
 By "minimizing" independent collection of primary data, and then restricting state tests of primary data that DOE has collected, the Phase III Guidelines eviscerate the independent oversight role that Congress envisioned for the states. Permitting DOE to "guard the chicken coop" alone would violate the statutory finding that state participation and oversight of DOE is "essential in order to promote public confidence in the safety of disposal of [nuclear] waste." Sec. 111(a)(6), 42 U.S.C. Sec. 10131(a)(6).
 
 
 43
 The Secretary's construction of Sec. 116(c)(1)(B) is inconsistent with the statutory mandate and a frustration of congressional policy. See Louisiana-Pacific Corp., 754 F.2d at 1447. Consistent with its duties under a consultation-cooperation agreement, see Sec. 117(b) & (c)(8), 42 U.S.C. Sec. 10137(b) & (c)(8), DOE must fund relevant site characterization activities which are reasonable, scientifically justifiable, and performed by demonstrably competent contractors, and which would not unreasonably interfere with or delay DOE's own activities.
 
 
 44
 IV. Conclusion.
 
 
 45
 The findings and general purposes of the statute support funding of the state's pre-site characterization studies. In addition, because such backup studies are essential to the "statement of reasons" that must accompany the state's disapproval of a site recommendation, see Sec. 116(b), the studies are "required by Sec. 116" and therefore fundable under the catch-all provision of Sec. 116(c)(1)(A).
 
 
 46
 Because DOE's Guidelines seek to "minimize" independent collection of primary data, and require DOE approval before any federally-funded tests can be run on the primary data that DOE has collected, they undermine the independent oversight role that Congress envisioned for the states. Nevada is entitled to funding of its relevant pre-site characterization activities subject to the limitations defined herein. The sections of the Guidelines which govern site characterization are unlawful.
 
 
 47
 REVERSED AND REMANDED.
 
 
 
 *
 Secretary John Herrington is substituted for his predecessor pursuant to Federal Rule of Appellate Procedure 43(c)
 
 
 **
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 DOE does not argue that its denial of funding is not a "final decision" subject to review under 42 U.S.C. Sec. 10139(a). This case involves a denial of funding with an immediate, direct impact on Nevada's activities, see infra sections III A and B, rather than the choice of a potential site which the Fifth Circuit has recently held to be unripe for judicial review. See State of Texas v. United States Department of Energy, 764 F.2d 278 (5th Cir.1985)
 
 
 [2]
 Nevada's studies can only contribute to the success of DOE's site evaluation program. If Nevada confirms DOE's conclusions, DOE will be better able to make its case before the Nuclear Regulatory Commission in future licensing proceedings under Sec. 114(d) of the NWPA, 42 U.S.C. Sec. 10134(d). If Nevada discovers significant flaws in DOE's findings, DOE could turn its attention to other sites and cut short the expenditure of money, time, and manpower for the evaluation of a site which would later turn out to be unsuitable. Cf. General Electric Uranium Mgmt. Corp. v. United States Dept. of Energy, 764 F.2d 896, 898 (D.C.Cir.1985) (explicitly applying policy considerations to resolve statutory ambiguity in NWPA)
 
 
 [3]
 Congress recognized the importance of such studies in another context, where the statute authorizes funding of "reasonable independent monitoring and testing of activities on the repository site" when provided for by written agreement between the state and DOE. See Sec. 117(c)(8)
 Although the state relies heavily on sections 116(c)(1)(B) and 117(c)(1) and (8), which indicate that "monitoring, testing, or evaluation activities" are eligible for funding, these provisions by their express terms are only applicable once a state has been chosen for site characterization or has entered into a written agreement with DOE. Because Nevada has not entered the site characterization stage and has not sought to enter into an agreement with DOE, it cannot invoke these provisions to fund its pre-site characterization activities.