**STATE OF NEVADA, Petitioner,**

v.

**U.S. DEPARTMENT OF ENERGY,**
**Respondent.**

No. 96–70774.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 1997.

Decided Jan. 13, 1998.

Harry W. Swainston, Deputy Attorney General, Carson City, Nevada, for petitioner.

Martin W. Matzen & John A. Bryson, United States Department of Justice, Washington, DC, for respondent.

Before: ALDISERT,* D.W. NELSON, and TASHIMA, Circuit Judges.

D.W. NELSON, Circuit Judge:

The State of Nevada files this petition for review of the Secretary of Energy's final decision to deny Nevada's request for funds from the Department of Energy's fiscal year ("FY") 1996 appropriations. Nevada maintains that it is entitled under Section 116(c)(1) of the Nuclear Waste Policy Act, 42 U.S.C. § 10136(c)(1) (1994), to receive funds for the purpose of reviewing, monitoring, and evaluating the Department of Energy's site characterization activities at Yucca Mountain, Nevada. We have jurisdiction pursuant to 42 U.S.C. § 10139(a)(1)(B), and we deny the petition for review of the Secretary of Energy's decision to deny the funds.

## FACTUAL AND PROCEDURAL BACKGROUND

The Nuclear Waste Policy Act of 1982 ("NWPA") requires the United States Department of Energy ("DOE") to site, construct, and operate a repository for the disposal of high-level nuclear waste. 42 U.S.C. § 10131(b)(1). As amended in 1987, the NWPA provides that Yucca Mountain, Nevada is the sole area to be evaluated as a potential site for the first waste dump. 42 U.S.C. § 10172. The NWPA accordingly permits the DOE to carry out appropriate "site characterization" activities at Yucca Mountain: activities performed for the purpose of evaluating and testing the condition of a candidate site. 42 U.S.C. § 10101(21). In connection with the DOE's site characterization at Yucca Mountain, the Secretary of Energy must provide Nevada and affected local governments with funds enabling them to review, monitor, and evaluate the DOE's site activities. 42 U.S.C. § 10136(c).

In order to finance state oversight activity and other costs incurred by site characterization under the NWPA, Congress established a Nuclear Waste Fund ("NWF"), derived from a levy on nuclear waste generators and owners. 42 U.S.C. § 10131(b)(4). Each year, Congress appropriates money from the NWF for the Secretary's use in administering the NWPA. 42 U.S.C. § 10222. Nevada and affected local governments must then apply to the Secretary for grants to finance their oversight activities. 42 U.S.C. § 10136(c)(2).

Since 1989, Congress has imposed specific limits on the amount of funding that Nevada is entitled to receive for its oversight activities, generally allowing the State about $5 million annually. For FY 1990, Nevada submitted a $26 million grant application, and Congress ultimately appropriated $5 million for the State's oversight activities. According to the legislative history of the 1990 Energy and Water Development Appropriation Act, Pub.L. No. 101–101, an additional $6 million was fenced-off in FY 1990, "to be available at the discretion of the Secretary of Energy based upon his certification to Congress of good faith efforts and cooperation on the part of the State in allowing technical field work . . . to proceed at the Yucca Mountain site." S.Rep. No. 101–83, at 132 (1989). In January 1995, the DOE certified Nevada's good faith efforts and cooperation, and released the $6 million for Nevada's use "in conducting appropriate oversight activities as authorized by the Nuclear Waste Policy Act." The State Controller of Nevada, Darrel Daines, responded in a letter explaining that the State was returning the $6 million to the DOE because "[t]here is no current need for these funds." The DOE therefore held the $6 million in an account from which Nevada was permitted to draw as needed.

In August 1995, Nevada wrote the DOE requesting a $5.5 million budget for FY 1996 for the purpose of conducting "oversight and related activities." Congress subsequently passed the FY 1996 Energy and Water Appropriations Act, which did not include grants for Nevada or for units of local government affected by the DOE's site characterization activities at Yucca Mountain. The DOE responded to Nevada's funding request in a letter, dated December 1995, which explained that Congress had not specifically authorized payments to Nevada in its FY 1996 appropriations. The DOE nevertheless proposed to provide such payments, but at a

---

* The Honorable Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

lower level than had been provided in previous years. The DOE explained, "[W]hile Congressional intent is not clear, the Appropriations Act and legislative history do not negate the Department's obligation to make payments to the State and affected units of local government under the NWPA."

In a letter dated January 1996, the Chairman and Ranking Minority Member of the Subcommittee on Energy and Water Development, House Committee on Appropriations, "emphatically rejected" the DOE's position, explaining that it was "based on a gross misinterpretation of congressional intent." They explained that it had not addressed grants to Nevada in its FY 1996 appropriations because it did not intend for Nevada to receive any funding at all that year for its oversight activities.

In March 1996, the DOE publicly announced that it would not be making payments to Nevada for its NWPA oversight activities during FY 1996. A follow-up letter to Congress dated April 1996 reiterated the DOE's decision not to provide funds to Nevada for FY 1996. In that letter, the DOE informed Congress that it had "accept[ed] the view of the [congressional] Subcommittee on this matter."

In September 1996, Nevada timely petitioned this court for review of the DOE's decision. After Nevada had filed its opening brief, the DOE filed a motion for remand to allow the DOE to supplement the record with its rationale for not granting financial assistance to Nevada in FY 1996. In April 1997, this court granted the DOE's motion "for the limited purpose of enabling the Department of Energy to supplement the record with its rationale for not granting Nevada's request for funds." *Nevada v. United States Dep't of Energy,* No. 96–70774 (9th Cir. Apr. 15, 1997).

The DOE subsequently supplemented the record in this case with a letter from Lake Barrett ("Lake Barrett letter"), Acting Director of the Office of Civilian Radioactive Waste Management, which articulated the DOE's basis for disposing of Nevada's request for financial assistance for FY 1996. The Lake Barrett letter explained that although the DOE is required under the NWPA to make grants to Nevada "enabling"

it to conduct certain oversight activities, the NWPA does not require "that such grants be made on a yearly or any other periodic basis, nor does it mandate that any particular level of funding be provided or give the State an entitlement to have its funding requests automatically approved." The Lake Barrett letter stated that the DOE's decision not to provide funds for FY 1996 was based on the fact that in FY 1995, Nevada had received $5.5 million, and an additional $6 million in funds that originally had been appropriated in 1990, but were released in January 1995. The Lake Barrett letter also mentioned that Nevada had promptly returned the $6 million to the DOE, stating that it had no "current need" for the funds. The Lake Barrett letter noted that at the beginning of FY 1996, Nevada had $6.8 million available to it, consisting of the entire $6 million released to the State in January 1995, plus $800,000 carried over from the State's FY 1995 grant payment from the DOE.

In response to the Lake Barrett letter, Nevada filed a motion for leave to file an appendix, containing material that allegedly "disproves DOE's assertions." We have construed Nevada's motion as a motion to supplement the record, and we have granted the motion. *Nevada v. United States Dep't of Energy,* No. 96–70774 (9th Cir. Dec. 15, 1997).

## DISCUSSION

█ We will only set aside the Secretary of Energy's decision if it was arbitrary, capricious, or otherwise not in accordance with law. *County of Esmeralda v. United States Dep't of Energy,* 925 F.2d 1216, 1219 (9th Cir.1991). We review questions of statutory interpretation de novo. *Nevada v. Herrington,* 827 F.2d 1394, 1396 (9th Cir. 1987).

I. *The DOE did not violate its obligation under the NWPA to fund Nevada's oversight activities.*

A. *The DOE's decision is not in conflict with either the statutory language of the NWPA or the interpretive case law of this court.*

█ Nevada's central argument on appeal is that the Secretary of Energy blatantly

violated the NWPA and "decided to disregard [her] statutory obligation" to provide Nevada with funds in FY 1996. Nevada's argument, however, is not supported by the language of the NWPA, which provides:

The Secretary shall make grants to the State of Nevada and any affected unit of local government for purposes of enabling such State or affected unit of local government-

. (i) to review activities taken under this part with respect to the Yucca Mountain site for purposes of determining any potential economic, social, public health and safety, and environmental impacts of a repository on such State, or affected unit of local government and its residents;

(ii) to develop a request for impact assistance under paragraph (2);

(iii) to engage in any monitoring, testing, or evaluation activities with respect to site characterization programs with regard to such site;

(iv) to provide information to Nevada residents regarding any activities of such State, the Secretary, or the Commission with respect to such site; and

(v) to request information from, and make comments and recommendations to, the Secretary regarding any activities taken under this part with respect to such site.

42 U.S.C. § 10136(c)(1)(B). It is clear from the statute that Nevada must be given the opportunity to participate in repository siting decisions, and that the DOE must provide funds for that purpose. Moreover, the law of this circuit instructs that Nevada's independent oversight of the DOE's site characterization is critical to the operation of the NWPA. *See Nevada v. Herrington,* 777 F.2d 529, 532 (9th Cir.1985) ("The independent oversight and peer review which only the states are poised to provide would immeasurably 'promote public confidence' in general and among Nevada residents in particular.") (citation omitted); *id.* at 533 ("[S]tates 'should be entitled to the broadest possible rights and opportunities to participate in the development of the facilities.'") (citation omitted).

■ However, as the DOE correctly maintains, the statute does not indicate that the DOE is required to provide Nevada with annual grants or with a specified amount of money; nor does it suggest that the DOE is obligated to accede to the terms of Nevada's requests for financial assistance. The NWPA only mandates that the DOE provide sufficient funds "enabling" Nevada to perform necessary oversight activities. In fact, the DOE, over the years, has consistently provided Nevada with less money than Nevada has requested in its grant applications. And although it is true that FY 1996 is the first year since site characterization activities began at Yucca Mountain that the Secretary did not grant the State any funds at all, the Secretary's decision is well supported by undisputed evidence in the record indicating that Nevada had $6.8 million available to it at the beginning of FY 1996. This court has made clear that Nevada "is not entitled to *carte blanche* access to the Nuclear Waste Fund." *Herrington,* 777 F.2d at 534. Nevada and affected units of local government are only entitled to funding for activities that are "essential" to their independent oversight role. *Id.* In view of the fact that the funds available to Nevada in FY 1996 ($6.8 million) exceeded the funds available to the State in previous years (approximately $5 million annually), we find that Nevada was adequately equipped to perform the requisite oversight activities.

Nevada relies heavily on *Nevada v. Herrington,* 777 F.2d 529 (9th Cir.1985), in which Nevada successfully appealed the DOE's decision to deny funding for technical studies designed to evaluate whether the Yucca mountain site should be used as a nuclear waste repository. At issue in *Herrington* were guidelines promulgated by the DOE that minimized Nevada's ability to collect primary data, and required that Nevada obtain the DOE's approval before testing primary data collected by the DOE. *See id.* at 535–36. We concluded in *Herrington* that the guidelines were "unduly restrictive," and that the "DOE must fund relevant site characterization activities which are reasonable, scientifically justifiable, and performed by demonstrably competent contractors, and which would not unreasonably interfere with or delay DOE's own activities." *Id.* at 536.

Unlike in *Herrington*, the DOE in the instant case has not "eviscerate[d] the important oversight role that Congress envisioned for the states." *Id.* This case is not a challenge to guidelines that categorically restrict funding for entire types of oversight activities. Here, the DOE decided in an exercise of discretion that Nevada had sufficient funds at its disposal to conduct independent oversight of the DOE's site characterization activities. Because Nevada does not contest the fact that it had $6.8 million available to it at the beginning of FY 1996, we conclude that the DOE's decision rests on firm ground.

B. *Nevada is not entitled to earmark the $6 million originally appropriated in FY 1990 for purposes identified in the State's FY 1990 grant application.*

■ Nevada insists that it had insufficient funds to perform the requisite oversight activities because the $6 million originally assigned to it by the DOE in 1990, but not released until January 1995, was intended exclusively for projects identified in the State's FY 1990 grant application. Nevada argues that the DOE incorrectly assumed that the $6 million could be applied to oversight projects described in Nevada's FY 1996 application. We reject this argument. The NWPA does not indicate that Nevada has the right to earmark funds for certain designated purposes. Moreover, it was not arbitrary or capricious for the DOE, in reviewing Nevada's FY 1996 grant application, to consider the oversight plans proposed in the FY 1996 application in conjunction with Nevada's existing pool of funds. The DOE released the $6 million to Nevada in 1995 "for the use by the State in conducting appropriate oversight activities as authorized by the Nuclear Waste Policy Act." The money was not released for the particular purposes described in Nevada's FY 1990 grant application; it was specifically released for general oversight activities.

Moreover, in reaching its decision, the DOE had before it the statement of the Nevada State Controller, Darrel Daines, that Nevada had no immediate need for the $6 million released in January 1995. Indeed, if Nevada was committed to applying the $6 million to projects described in its FY 1990 grant application, it seems peculiar for the State to have returned the money to the DOE. Nevada claims that it returned the funds to avoid interest accumulation problems created by Section 5 of the Cash Management Improvement Act of 1990, 31 U.S.C. § 6503. Nevertheless, as the DOE aptly points out, Nevada's attempt at evading its statutory obligation to remit the accumulated interest to the government in no way undermines or negates Darrel Daines' assertion that "[t]here is no current need for" the $6 million. Because Nevada is ultimately unable to explain away Daines' statement, Nevada's argument concerning the avoidance of interest accumulation is unavailing. In sum, it is not at all apparent from the record why Nevada could not continue to conduct oversight activities with the $6.8 million it had in its pocket at the beginning of FY 1996 (a slightly larger budget than it had in previous years).

II. *The DOE's rationale for denying Nevada funds is permissible and not inconsistent with its earlier statements responding to Nevada's FY 1996 grant application.*

■ Nevada's second main claim on appeal is that the DOE's current reason for denying Nevada funds, expressed in the Lake Barrett letter, "must be rejected as a post hoc rationalization." Arguing that the DOE's present rationale (which points to the $6.8 million in oversight funds available to Nevada at the beginning of FY 1996) is inconsistent with its earlier statements, Nevada maintains that the DOE should be estopped from changing its reasoning at this late stage of the litigation. We conclude that there is no basis for this contention.

The DOE never made any statements that are inconsistent with its current rationale as articulated in the Lake Barrett letter. The DOE stated in its initial response to Nevada's request, "We accept the view of the Subcommittee on this matter, and will not be making such payments this fiscal year." Nevada argues that this statement thinly veils the DOE's "real reason" for disposing of its request for FY 1996 funds: "a desire to satisfy individual members of Congress."

Nothing in the record, however, supports this claim. The DOE merely "accepted the view" of Congress that Nevada should not receive any funds; it did not express an intent to curry congressional favor. Moreover, in granting the DOE's motion for remand to supplement the record with a rationale for denying Nevada's request for funds, this court plainly indicated that an explanation for the DOE's decision was absent from the existing record. *Nevada v. United States Dep't of Energy*, No. 96–70774 (9th Cir. Apr. 15, 1997). In sum, the DOE in this case simply failed initially to offer a reason for denying Nevada funds from its FY 1996 appropriations. The DOE stated that it agreed with Congress without offering a basis for its decision; it did not "change its position," as Nevada argues. The DOE therefore is not estopped from offering the rationale for its decision as set forth in the Lake Barrett letter.

III. *The DOE's failure to provide funding to Nevada was not an unlawful imposition of an unfunded federal mandate in violation of the Unfunded Mandates Reform Act of 1995.*

■ Nevada also posits that in denying the State's FY 1996 grant request, the DOE violated the terms of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. § 1501. Because the DOE's decision clearly falls outside the scope of the Unfunded Mandates Reform Act, Nevada's claim must fail.

The Unfunded Mandates Reform Act concerns "federal intergovernmental mandates" that either impose an enforceable duty on a state or reduce appropriations for federal financial assistance that are provided to the state for the purpose of complying with an imposed enforceable duty. 2 U.S.C. § 658(5)(A). The NWPA, however, imposes no enforceable duty on Nevada. Rather, the statute offers Nevada the opportunity to request financial assistance enabling it to conduct oversight activities. 42 U.S.C. § 10136(c)(1)(C). If Nevada discovers that the DOE's site characterization has a negative economic, social, public health and safety, or environmental impact on the State, it "*may* disapprove the site designation and submit to the Congress a notice of disapprov-

al." 42 U.S.C. § 10136(b)(2) (emphasis added).

■ Even if this statutory invitation to participate in repository siting decisions is construed as an enforceable duty, the fact remains that it was not unfunded. As we have maintained throughout this opinion, Nevada had ample funds at the beginning of FY 1996 to conduct essential oversight activities. Because the DOE's decision is so plainly outside the purview of the Unfunded Mandates Reform Act, we reject this claim.

IV. *The DOE's failure to provide a grant to Nevada for FY 1996 did not cause Nevada's governmental processes to be unconstitutionally commandeered into federal service.*

■ Finally, Nevada contends that its governmental processes were commandeered into federal service in violation of the Tenth Amendment. Nevada likens the DOE's denial of funding in this case to the "take title" provision of the Low–Level Radioactive Waste Policy Amendments Act of 1985, which was struck down by the Supreme Court in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The Court held in *New York v. United States* that the take title provision was constitutionally invalid because it "commandeer[ed] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." 505 U.S. at 176, 112 S.Ct. at 2428 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)). Here, Nevada has not been directly compelled to enact or enforce a federal regulatory program. Rather, as explained above, the NWPA provides Nevada with the opportunity to participate in repository siting decisions. *See* 42 U.S.C. § 10136. The NWPA itself, however, is implemented entirely by federal government agencies. Moreover, the DOE is not "[f]orcing Nevada to pay its own costs of participation in the disposal program," as Nevada argues. Because Nevada had $6.8 million of federal funds available to it at the beginning of FY 1996, there is no conceivable reason why it was required to absorb any of the costs

associated with its oversight of the DOE's Yucca Mountain site characterization activities.

### CONCLUSION

For the foregoing reasons, we deny the petition for review of the DOE's decision not to provide Nevada funds from its FY 1996 appropriations. The DOE fulfilled its statutory obligation under the NWPA to ensure that Nevada had sufficient funds enabling it to perform the essential oversight activities.

PETITION FOR REVIEW DENIED.