# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 10, 2005        Decided March 8, 2005

Reissued May 3, 2005

No. 04-1082

STATE OF NEVADA,
PETITIONER

v.

DEPARTMENT OF ENERGY AND
SAMUEL BODMAN, SECRETARY, UNITED STATES
DEPARTMENT OF ENERGY,
RESPONDENTS

---

Consolidated with
04-1319

---

On Petition for Review of an Order of the
Department of Energy

---

*Robert J. Cynkar* argued the cause for petitioner. With him on the briefs were *Joseph R. Egan*, *Martin G. Malsch*, *Brian Sandoval*, Attorney General, Attorney General's Office of the State of Nevada, and *Marta A. Adams,* Senior Deputy Attorney General.

*Ronald M. Spritzer*, Attorney, U.S. Department of Justice,

argued the cause for respondents. With him on the brief were *Greer S. Goldman* and *John A. Bryson*, Attorneys, and *Marc Johnston*, Counsel, U.S. Department of Energy.

*Michael A. Bauser* and *Robert W. Bishop* were on the brief for *amicus curiae* Nuclear Energy Institute, Inc. in support of respondents.

Before: RANDOLPH and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Concerned about the construction of a nuclear waste repository at Yucca Mountain, Nevada, the State of Nevada asked the Department of Energy for a fiscal year 2004 grant to fund its participation in an upcoming Nuclear Regulatory Commission proceeding that will determine whether the project receives a license. Nevada argues that it is entitled to a grant pursuant to section 116 of the Nuclear Waste Policy Act, which provides that the Secretary of Energy "shall make grants to the State of Nevada" from the Nuclear Waste Fund—a special repository-related fund. Rejecting Nevada's request, the Energy Department concluded that contrary to the state's argument, section 116 creates no continuing appropriation for Nevada, and that Congress's enactment of a separate $1 million FY04 appropriation expressly for Nevada bars any additional grant from the Waste Fund. We agree.

## I.

In 1983, responding to growing quantities of radioactive waste and their potentially deadly health risks, Congress enacted the Nuclear Waste Policy Act ("NWPA"), which directed the federal government to begin the process of developing a nuclear waste repository. Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10101-10270). Among

other things, the NWPA directed the Secretary of Energy to find an appropriate site for the nation's repository, 42 U.S.C. §§ 10132-10133, and, following approval of the site by the President, to apply to the Nuclear Regulatory Commission for a license to begin construction, *id*. §§ 10134-10135. We describe the NWPA and subsequent repository-related developments in *Nuclear Energy Institute v. EPA*, 373 F.3d 1251, 1258-61 (D.C. Cir. 2004) ("*NEI*").

To finance the repository's development, NWPA section 302 established the Nuclear Waste Fund ("the Waste Fund"), a "separate fund" in the Treasury, 42 U.S.C. § 10222(c), "composed of payments made by the generators and owners of [nuclear] waste," *id.* § 10131(b)(4). Generators of nuclear waste contribute to the fund according to the amount of electricity they produce. *Id.* § 10222(a). Under section 302, "[t]he Secretary [of Energy] may make expenditures from the Waste Fund . . . only for purposes of radioactive waste disposal activities." *Id.* § 10222(d). Using language central to the issue before us, section 302 also makes the Secretary's authority to spend Waste Fund money "subject to appropriations." *Id*. § 10222(e)(2).

Congress believed that "[s]tate . . . participation" in the repository program "is essential." *Id*. § 10131(a)(6). Accordingly, Congress created mechanisms by which affected states could monitor repository development activities and participate in major repository-related decisions. *See generally id*. §§ 10131-10137. Through NWPA section 116, Congress also established a program of financial assistance for states that choose to take part in the repository development process. *See* NWPA § 116(c).

Pursuant to the NWPA, *see* 42 U.S.C. § 10132(b)(1)(A), the Department of Energy ("DOE") examined several potential repository sites in several states. *See NEI*, 373 F.3d at 1259. In 1987, however, through an amendment to the NWPA, Congress directed the Secretary to consider building a repository only at

Yucca Mountain. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 § 5011, 101 Stat. 1330 at 227-31 (1987) (codified at 42 U.S.C. § 10172). At the same time, Congress revised NWPA section 116, narrowing it to mandate grants only to "the State of Nevada and any affected unit of local government." *Id*. § 5032, 101 Stat. 1330 at 241-43 (codified at 42 U.S.C. § 10136(c)). Revised section 116 now provides that "[t]he Secretary shall make grants to the State of Nevada . . . for purposes of enabling" it to, among other things, "review activities taken under this part with respect to the Yucca Mountain site for purposes of determining any potential economic, social, public health and safety, and environmental impacts of a repository" and "make comments and recommendations" to the Secretary of Energy "regarding any activities taken under this part with respect to such site." 42 U.S.C. § 10136(c)(1)(B). Such "[f]inancial assistance," section 116 specifies, "shall be made out of amounts held in the Waste Fund." *Id*. § 10136(c)(5).

For each appropriations cycle beginning with the NWPA's passage and continuing through FY04, Congress appropriated substantial amounts from the Waste Fund "for nuclear waste disposal activities." *See, e.g.*, Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 148 (2003). In most cycles, Congress expressly provided either that Nevada would receive none of this money or that the state would receive some portion of it through direct payment, instead of through the grants envisioned by section 116. *See, e.g.*, *id.*; Energy and Water Development Appropriations Act, 2002, Pub. L. No. 107-66, 115 Stat. 486, 503 (2001); Departments of Veterans Affairs and Housing and Urban Development—Appropriations, Pub. L. No. 106-377, 114 Stat. 1441 at A-73 (2000). In those cycles where Congress said nothing about funding for Nevada, *see, e.g.,* Energy and Water Development Appropriations Act, 1996, Pub. L. No. 104-46, 109 Stat. 402, 413 (1995); Energy and Water Development Appropriations Act, 1986, Pub. L. No. 99-

141, 99 Stat. 564, 573 (1985); Energy and Water Development Appropriations Act, 1985, Pub. L. No. 98-360, 98 Stat. 403, 414 (1984), DOE made grants to the state from the annual Waste Fund appropriation (except for one year when Nevada had money left over from a prior appropriation). *See Nevada v. Dep't of Energy*, 133 F.3d 1201, 1205 (9th Cir. 1998).

For fiscal year 2004—the year at issue in this case—Congress appropriated "$190,000,000 . . . to be derived from the Nuclear Waste Fund" "[f]or nuclear waste disposal activities to carry out the purposes of Public Law 97-425." Energy and Water Development Appropriations Act, 2004, Pub. L. No. 108-137, 117 Stat. 1827, 1855 (2003) ("2004 Appropriations Act"). While saying nothing one way or the other about whether Nevada should receive any of the $190 million, the very same bill provides that "[o]f the funds made available . . . for Defense Environmental Services," funds not derived from the Waste Fund, "$1,000,000 shall be provided to the State of Nevada . . . to conduct scientific oversight responsibilities and participate in licensing activities pursuant to the" NWPA. *Id*. at 1865.

Following passage of the FY04 appropriations legislation, Robert Loux, Executive Director of Nevada's Agency for Nuclear Projects, advised DOE by letter that the state intended to spend $5 million on "licensing preparation" and scientific oversight in FY04, observed that the state had received only $1 million from the DES appropriation, and asserted that DOE was obliged to make up the difference with grants from the Waste Fund. According to Loux, "[t]he provisions of Section 116 and those establishing the Nuclear Waste Fund" create a continuing appropriation for the state. The Secretary therefore "has a legal duty to make grants from the Nuclear Waste Fund to Nevada . . . even if Congress has enacted no appropriation for such funding or Nevada's needs exceed the appropriation."

Responding to Loux, Dr. Margaret Chu, Director of DOE's

Office of Civilian Radioactive Waste Management, "disagree[d] with [Nevada's] position . . . that section 116 of the NWPA, without more, 'imposes on DOE an obligation to assist Nevada financially.'" Chu asserted that because NWPA section 302 "specifically makes expenditures of Nuclear Waste Fund funds subject to an appropriation," "[t]he language of the 2004 Appropriations Act . . . governs the terms on which Nevada may receive funds." Pointing out that Congress had appropriated $1 million for Nevada, she explained that "[i]t is settled appropriations law that where, as here, there is a specific appropriation for a particular item," an agency cannot supplement it with money from a more general appropriation. Consequently, Chu concluded, "Congress left no doubt that it intended to cover all of Nevada's FY04 funding requirements with the $1 million that it appropriated."

Nevada now seeks review of Dr. Chu's determination.

## II.

The parties disagree about the level of deference we owe Dr. Chu's analysis. Asserting that "Congress . . . implicitly delegated to [it] the authority to interpret . . . the NWPA," DOE urges us to review Chu's conclusion under the deferential standard outlined in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Respondent's Br. at 17-18. By contrast, Nevada contends that we owe deference under neither *Chevron* nor *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *Chevron* is inapplicable, Nevada insists, because Chu's conclusion "was not the fruit of . . . rulemaking or formal adjudication," Petitioner's Br. at 33, and *Skidmore* does not apply because "DOE's letter advances" only "unsupported and erroneous characterizations," *id*. at 34-36. We need not resolve this debate, however, for even reviewing de novo we reach the same result as Chu.

Commanding that "No Money shall be drawn from the

Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I. § 9, cl. 7, the Appropriations Clause of the U.S. Constitution "vests Congress with exclusive power over the federal purse." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992). For Nevada to prevail, then, it must identify not just a command to make grants, but an appropriation of Waste Fund money that DOE may use for that purpose. Nevada tries to do so in two ways. First, it asserts that NWPA section 116 creates a continuing appropriation for it, requiring DOE to grant reasonable sums from the Waste Fund in any year Congress fails to prohibit such grants. Second, Nevada argues that even if section 116 does not amount to a continuing appropriation, it requires DOE to make grants from the $190 million FY04 appropriation for "nuclear waste disposal activities." We examine each contention in turn.

### *Does Section 116 Create a Continuing Appropriation?*

A continuing appropriation is one that "is always available for specified purposes and does not require repeated action by Congress to authorize its use." 1 Office of the General Counsel, United States General Accounting Office, Principles of Federal Appropriations Law 2-14 (3d ed. 2004) ("POFAL"). Relying on section 116's requirement that "[t]he Secretary shall make grants to the State of Nevada," 42 U.S.C. § 10136(c), and its provision specifying that such grants "shall be made out of amounts held in the Waste Fund," *id*. § 10136(c)(5), Nevada contends that section 116 creates just such a continuing appropriation. According to Nevada, the mandatory phrase "shall make grants" amounts to "a specific direction to pay," which the Government Accountability Office ("GAO") would treat as an appropriation. Petitioner's Br. at 38. Nevada also informs us that the GAO "view[s] statutes which authorize the collection of fees and their deposit into a particular fund, and which make the fund available . . . for a specified purpose, as constituting continuing or permanent appropriations." *Id*. (quoting 59 Comp. Gen. 215

(1980)). Given that Waste Fund revenues come from fees paid by waste generators, Nevada therefore concludes, section 116's express reference to the Waste Fund makes clear that this section creates a continuing appropriation.

Nevada's argument falters on the fact that section 302 makes expenditures from the Waste Fund, including section 116 grants, "subject to appropriations." 42 U.S.C. § 10222(e)(2). As DOE observes, "there is nothing unclear . . . about the meaning of [this] phrase." Respondent's Br. at 32. The phrase "expressly limits DOE's authority to make expenditures from the Waste Fund to the amounts" later "appropriated by Congress." *Id*. at 31. Given section 302's plain language, moreover, the GAO's belief that a statute may "be construed as making an appropriation if it contains a specific direction to pay . . . and a designation of the [f]unds to be used," 63 Comp. Gen. 331, 335 (1984), proves unhelpful to Nevada, for the state has identified no authority, nor have we found any, ruling that a statute creating a funding source and ordering payment "subject to appropriations" amounts to a continuing appropriation. Similarly, while the GAO has treated "statutes which authorize the collection of fees and their deposit into a particular fund, and which make the fund available . . . for a specified purpose, as constituting continuing or permanent appropriations," 59 Comp. Gen. 215, 216-17 (1980), neither Nevada nor we have identified any authority suggesting that a continuing appropriation exists when Congress creates a special fund but makes spending from it "subject to appropriations."

Nevada argues that when Congress wants to require annual appropriations for special fund expenditures, it uses one of several more direct phrases, such as "[s]ubject to such amounts as are provided in Appropriations Acts," Petitioner's Br. at 51 (quoting 26 U.S.C. § 9611(c)(3)), "as provided in appropriation Acts," *id*. (quoting 26 U.S.C. § 9507(c)(1)), or "as provided by appropriation Acts," *id*. (quoting 26 U.S.C. § 9503(e)(3)). To be

sure, such phrases are more precise than section 302, but "subject to appropriations" means just that—subject to appropriations. The statutes cited by Nevada indicate nothing more than that Congress has several ways of requiring appropriations before an agency may spend from a special fund. In a similar vein, Nevada argues that NWPA section 141, by providing that states hosting a monitored retrievable storage ("MRS") facility will receive grants "only to the extent provided in advance in appropriation Acts," Petitioner's Br. at 49 (quoting 42 U.S.C. § 10161(f)(4)), shows that Congress must not have required appropriations when it used the less explicit "subject to appropriations" language in section 302. Section 141, however, simply bars grants to states affected by an MRS facility absent an appropriation specifically for that purpose, i.e., DOE may not grant these states money out of a general-purpose appropriation designed to cover expenses related to a broadly defined goal or project.

Nevada insists that the phrase "subject to appropriations" merely permits Congress to "limit the amount of a grant" in any given year, "limit what a grant might be spent for," or "even cancel the prior appropriation" allegedly made by section 116. Petitioner's Br. at 45. This interpretation suffers from a fatal flaw: reading "subject to appropriations" as "capable of being limited in a subsequent appropriations act" would rob section 302 of any meaning, for Congress may always enact legislation limiting, modifying, or cancelling a previously enacted appropriation.

Attempting to find some purpose for section 302, Nevada tells us "there is no actual appropriation" for NWPA expenditures other than section 116 grants, and "[f]or purposes of these authorized expenditures . . . the 'subject to appropriations' language refers to the appropriations that are indeed needed to actually make those expenditures." *Id*. at 46-47. In other words, according to Nevada, as applied to section

116 grants, the phrase "subject to appropriations" merely means Congress may limit expenditures through subsequent appropriations, but as applied to other Waste Fund expenditures the phrase means no spending may occur absent an annual appropriation by Congress. We disagree. Not only must a single clause—here section 302's requirement that "[t]he Secretary may make expenditures from the Waste Fund" "subject to appropriations"—mean the same thing with respect to every provision that it modifies, but Nevada's theory still leaves "subject to appropriations" devoid of meaning as applied to section 116.

Contrary to Nevada's contention, nothing in the policies underlying Congress's creation of the Waste Fund suggests the existence of a continuing appropriation. It is true, as Nevada points out, that Congress created the Waste Fund "to ensure that 'the costs of carrying out activities relating to the disposal of [radioactive] waste and spent fuel will be borne by the persons responsible for generating such waste or spent fuel.'" *NEI*, 373 F.3d at 1259 (quoting 42 U.S.C. § 10131(b)(4)) (alteration in original). Yet requiring waste producers to finance the entire project is perfectly consistent with Congress's desire to maintain annual control over how much Waste Fund money DOE spends and how DOE spends it. It may also be true that Congress designed the Waste Fund to ensure that "appropriate levels of funding [would] be reliably available over the years the repository process would unfold," Petitioner's Br. at 12. Again, however, this has nothing to do with whether section 116 creates a continuing appropriation. The Waste Fund's independent source of revenue and the requirement that money in the Waste Fund be spent "only for purposes of radioactive waste disposal activities," 42 U.S.C. § 10222(d), ensure a consistent source of funding regardless of whether the NWPA amounts to a continuing appropriation. Indeed, although Nevada quotes one Senate sponsor of the NWPA for the proposition that the Waste Fund "would provide an assured source of funds" and eliminate

"annual budgetary perturbations in an evermore constrained Federal budget," 128 Cong. Rec. 32,557 (1982) (statement of Sen. McClure), the Senator also observed—in a phrase not quoted by Nevada—that under the NWPA fees paid by waste producers "would be placed in a separate account in the Treasury . . . and would then be appropriated . . . on an annual basis," *id*. at 32,556.

### *Must DOE Make a Grant from the FY04 Waste Fund Appropriation?*

Nevada asserts that even if it is not the beneficiary of a continuing appropriation, section 116—with its command that the Secretary "shall make grants" to it—requires DOE to grant it money from the $190 million FY04 Waste Fund appropriation for "nuclear waste disposal activities." Were this the sole repository-related appropriation for FY04, and assuming that section 116 mandates grants for activities related to licensing—an issue about which the parties disagree but that we need not address to resolve this case—we would agree with Nevada. As the Ninth Circuit has noted, section 116 speaks in mandatory terms, obliging DOE to grant Nevada reasonable sums for repository-related expenditures when Congress appropriates Waste Fund money for general repository-related purposes. *State of Nevada ex rel. Loux v. Herrington*, 777 F.2d 529, 536 (9th Cir. 1985). That is precisely what Congress did when it enacted the $190 million FY04 appropriation.

The issue of Nevada's eligibility for FY04 Waste Fund grants, however, is not so simple. In the same bill in which Congress appropriated the $190 million, it also appropriated $1 million from an alternate source expressly for Nevada. 2004 Appropriations Act, 117 Stat. at 1855, 1865. Reiterating Dr. Chu's analysis, DOE asserts that this appropriation specifically for Nevada precludes a grant from the Waste Fund appropriation.

Resolution of this issue is governed by the principle that "[a]n appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." 4 Comp. Gen. 476, 476 (1924). "[E]stablished 'from time immemorial,'" 1 POFAL 2-21 (quoting 1 Comp. Dec. 126, 127 (1894)), this rule makes applicable to appropriations bills the "general principle of statutory construction," *id.* at 2-23, reiterated repeatedly by the Supreme Court, that "a more specific statute will be given precedence over a more general one," *Busic v. United States*, 446 U.S. 398, 406 (1980). Here, Congress provided $1 million from the DES appropriation for "Nevada . . . to conduct scientific oversight responsibilities and participate in licensing activities," 2004 Appropriations Act, 117 Stat. at 1865—a purpose that covers all of Nevada's proposed FY04 expenditures. Far less specific, the $190 million appropriation contained in the very same bill covers "nuclear waste disposal activities" and never mentions Nevada. *See id.* at 1855. Thus, the $1 million appropriated expressly for Nevada would seem to bar any grants from the $190 million Waste Fund appropriation.

Nevada argues that the specific-over-general rule has no applicability to this case. "[T]he Defense Environmental Services account," the state contends, "is by its nature so distinctive, so different from a grant from the Waste Fund under § 116," that the $1 million provided in the DES appropriation cannot limit DOE's obligation to grant Nevada Waste Fund money. Petitioner's Br. at 55 (internal quotations omitted). According to the GAO, however, specific appropriations preclude the use of general ones even when the two appropriations come from different accounts. *See* 4 Comp. Gen. 476 (1924). For instance, the GAO found that an appropriation expressly for repairing jails in Alaska, made from a fund comprised of "fines, forfeitures, [and] judgments," precluded the financing of repairs to an Alaskan jail with funds appropriated from the Treasury for the more general purpose of "repairs,

betterments, and improvements of United States jails." *Id.* at 477-78. Although GAO decisions are not binding, we "give special weight to [GAO's] opinions" due to its "accumulated experience and expertise in the field of government appropriations." *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (internal quotations and citation omitted). GAO's view, moreover, seems exactly right. Even if the Defense Environmental Services and Waste Fund appropriations are as different as Nevada thinks, the fact that Congress appropriated $1 million expressly for Nevada indicates that is all Congress intended Nevada to get in FY04 from whatever source.

Directing our attention to section 116's statement that grants "shall be made out of amounts held in the Waste Fund," Nevada argues that no appropriation from a source other than the Waste Fund could have a preclusive effect. Yet while Congress appropriated the $1 million from a source not contemplated by section 116, this money serves the "specific purpose," *see* 4 Comp. Gen. at 476—financing "scientific oversight" and "licensing activities"—for which Nevada seeks funds from the $190 million "appropriation[] in general terms which might be applicable in the absence of the specific appropriation," *id*. The similarity between the $1 million appropriation and recent Waste Fund appropriations for Nevada, moreover, reinforces the conclusion that Congress viewed the $1 million as a substitute for assistance from the Waste Fund. In past years, Congress provided for a direct payment of Waste Fund money instead of the grants that section 116 envisions, specified that federal assistance go only to Nevada's Division of Emergency Management, and required the state to certify it used the funds for authorized purposes. *See* Consolidated Appropriations Resolution, 2003, 117 Stat. at 148-49; Energy and Water Development Appropriations Act, 2002, 115 Stat. at 503-04; Departments of Veterans Affairs and Housing and Urban Development—Appropriations, 114 Stat. at 1441A-73-

74.   Congress designed the $1 million FY04 appropriation for Nevada in exactly the same way, providing for direct payment to Nevada, specifying that the funds go to the Division of Emergency Management, and requiring the state to certify it used the funds for authorized purposes.   2004 Appropriations Act, 117 Stat. at 1865.

## III.

For the foregoing reasons, we agree with DOE that it lacks authority to provide Nevada with additional FY04 financial assistance from the Waste Fund.   The petition for review is denied.

*So ordered.*